Virginia SIMPSON, Plaintiff–Appellant,

v.

BORG–WARNER AUTOMOTIVE, INC., Defendant–Appellee.

No. 99–1048.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 1, 1999.

Decided Nov. 18, 1999.

Arthur R. Ehrlich (argued), Jonathan C. Goldman, Chicago, IL, for Plaintiff–Appellant.

Mark A. Casciari (argued), Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant–Appellee.

Before CUDAHY, EASTERBROOK and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

The plaintiff, Virginia Simpson, was hired as a production worker at Borg–Warner Automotive Transmission Systems Corp. (Borg–Warner) in 1972. In 1991, Borg–Warner promoted her to the supervisory position of Production Facilitator. In 1995, Simpson asked to return to a production line position, and her request was eventually granted. Simpson claims that her voluntary downgrade was a constructive demotion, and that this allegedly adverse employment action was prompted by sex discrimination in violation of Title VII of the Civil Rights Act. 42 U.S.C. § 2000e *et seq.* Simpson sued Borg–Warner in 1997; the district judge granted summary judgment in favor of the defendant in 1998. Simpson now appeals, and we affirm.

I. Facts

From 1991 to 1995, Simpson worked as a Production Facilitator supervising the afternoon shift at Borg–Warner's Bell-

wood, Illinois, facility. As a supervisor, her responsibilities included setting production schedules, coordinating workers' days off, monitoring safety and budgets and disciplining workers. Simpson's dissatisfaction with her employment at Borg–Warner apparently began in late 1993, when Ron Ames was appointed as Unit Manager to oversee Simpson and her fellow Production Facilitators. Simpson complains that several subsequent incidents combined to create an intolerable work situation. First, in July 1994, while substituting for another supervisor, Simpson noticed an employee removing "defective material" tags from product parts and putting them back in circulation. Simpson and Borg–Warner disagree whether company policy clearly barred the removal of tags from these parts in these circumstances. Simpson reported the worker to Ames. Ames later asked Simpson to speak with the worker, who was upset about the report. Simpson claimed it was to be an apology and refused, stating that such a conversation would undermine her authority.

A second dispute arose when Simpson reported that a worker under a colleague's supervision had failed to "punch in." The subordinate was suspended, and was told that Simpson had reported her. The employee then made an unspecified threat against Simpson, out of Simpson's presence, but in the presence of two other managers. When Simpson learned of the remark, she reported it to Ames. Verified threats are grounds for discharge at Borg–Warner. Ames did not immediately discharge the worker, claiming he did not think that the threat could be verified. He eventually learned there were witnesses to the threat, and the worker issued a second threat. Ames fired the worker.

Third, Simpson complains that Ames told her she had to take a basic skills test. Simpson had taken and failed the test in 1993. Despite Ames's directive, Borg–Warner did not re-test Simpson. Nevertheless, she protests that she was the only Production Facilitator "singled out" to take the test, which is designed to check a supervisor's basic math and communications skills. It is unclear from the record whether Simpson's male supervisory colleagues had ever taken the test, and if so, whether any or all of them had passed it. Appellee's App. Vol. II, Tab A at 59–66. For whatever reason, none of the male supervisors' personnel files included a notice that they had failed the test, and several of them had been "grandfathered" and therefore excused from taking the test. In 1995 Borg–Warner instituted a new policy of testing all workers at the level just below Production Facilitator. *See id.* Ames explained that Simpson was asked to take the test when the new policy was instituted because Simpson "needed at least to have the same skills as the people reporting in to her." *See id.*

Simpson's remaining complaints are comparatively minor. She alleges that a fellow supervisor told employees about her complaints about them; that this supervisor advised his team not to seek Simpson's help; and that Ames's informal reprimands to that supervisor did not correct the situation. Simpson alleges that Ames refused to assign new employees to her shift. Simpson charges that Ames gave her an "inaccurate" negative review. Finally, Simpson charges that Ames scratched his genitals while speaking with her.[1]

---

**1.** Several of these incidents to which Simpson points occurred well over 180 days before the filing of her discrimination charges with the Equal Employment Opportunity Commission. Under Title VII, such complaints are generally time-barred. 42 U.S.C. § 2000e–5(e). However, the "continuing violation doctrine" developed under Title VII allows a complain-

ant to obtain relief for a time-barred act of discrimination if she can link it with acts that fall within the statutory limitations period. In such a case, the court will treat the series of acts as one continuous act ending within the limitations period. *See Filipovic v. K & R Exp. Sys., Inc.,* 176 F.3d 390, 396–97 (7th Cir.1999). The continuing violation doctrine

## II. Analysis

We, of course, review the grant of summary judgment *de novo*, considering all facts in the light most favorable to Simpson, the non-movant, and resolving all inferences in her favor. *Vitug v. Multistate Tax Commission*, 88 F.3d 506, 511 (7th Cir.1995). Simpson has presented no direct evidence of sex discrimination; therefore, in order to succeed in her Title VII claim, she must prevail in the burden-shifting test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See also Bragg v. Navistar Int'l Trans. Corp.*, 164 F.3d 373, 376 (7th Cir.1998). Simpson must show that: (1) she was a member of a protected class; (2) she was qualified for the job in question or was meeting her employer's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) the employer treated similarly situated persons not in the protected class more favorably. *Bragg*, 164 F.3d at 376 (citing *Taylor v. Canteen Corp.*, 69 F.3d 773, 779 (7th Cir. 1995)). If Simpson establishes a prima facie case, Borg–Warner must articulate a legitimate, non-discriminatory reason for the adverse employment decision. *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 395 (7th Cir.1998). Simpson may then present evidence that Borg–Warner's proffered reason was pretextual. *Id.*

Simpson's most obvious obstacle—one she cannot clear—is the requirement of an adverse employment action. Simpson requested reassignment to a non-supervisory position in 1995; she contends

is not applicable where a discrete incident cannot be linked with others, or where the incident viewed alone should have triggered an employee's awareness of and duty to assert his or her rights. *See id.* at 396; *see also Selan v. Kiley*, 969 F.2d 560, 565 (7th Cir. 1992). The contested incidents in this case do not independently signal discrimination. But they are all linked because they all implicate Ron Ames, the alleged villain of Simpson's piece. Therefore, the continuing violation doctrine arguably applies, and we may properly consider all of these incidents.

this request was essentially a constructive demotion and therefore amounts to an adverse employment action satisfying the demands of Title VII. We disagree.

There is no question that demotion may be a materially adverse employment decision, whether that demotion is manifested by formal downgrade or by informal actions such as "a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993). However, in the situation before us Borg–Warner did not demote Simpson either overtly or covertly. She sought her downgrade; indeed, she turned down Borg–Warner's offer of transfer to another (and hopefully more congenial) supervisory position. Simpson contends that although she sought the downgrade, Borg–Warner had created an environment so inhospitable to her as a supervisor that she had no choice but to return to the non-managerial ranks. She describes this process as constructive demotion. Simpson cites no Seventh Circuit cases recognizing constructive demotion, and we find none to date. Other circuits have, however, recognized the concept. *See, e.g., Sharp v. City of Houston*, 164 F.3d 923, 933–34 (5th Cir.1999). Simpson analogizes her claim to one for constructive discharge. Appellant's Br. at 12. Borg–Warner follows suit. Appellee's Br. at 17 n. 4. We agree that a constructive demotion analysis should have the same structure as that for constructive discharge.[2]

2. Not surprisingly, the Fifth Circuit's constructive demotion analysis turns on the same factor crucial to this Court's constructive discharge analysis—the intolerable nature of the plaintiff's working conditions. *See Sharp v. City of Houston*, 164 F.3d 923, 934 (5th Cir. 1999). In *Sharp*, the female plaintiff requested transfer from the elite Mounted Patrol unit of the Houston Police Department after responding to an Internal Affairs Division probe into sexual harassment at the unit. *Id.* at 928. After cooperating with the probe, the

■ Establishing constructive discharge is a two-step process. First, "a plaintiff needs to show that his working conditions were so intolerable that a reasonable person would have been compelled to resign." *Rabinovitz v. Pena*, 89 F.3d 482, 489 (7th Cir.1996). Second, the conditions "must be intolerable because of unlawful discrimination." *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir.1998). We have characterized as intolerable working conditions that involved a series of escalating sexual remarks culminating in a physical assault and death threat. *Brooms v. Regal Tube Co.*, 881 F.2d 412, 423–24 (7th Cir.1989). Also intolerable was a work environment in which a manager held a gun to his subordinate's temple, took a picture and then circulated the picture at a company meeting, stating "this is what a nigger looks like with a gun to his head." *Taylor v. Western & Southern Life Ins. Co.*, 966 F.2d 1188, 1191, 1199 (7th Cir.1992). Intolerable, too, was a work environment where a subordinate's disputed sexual relationship with her supervisor led to a suicide attempt. *Snider v. Consolidation Coal Co.*, 973 F.2d 555, 557, 561 (7th Cir.1992).

In contrast, this Court has found a range of unpleasant and even embarrassing employer actions tolerable and therefore insufficient to effect a constructive discharge. For instance, an arbitrary reprimand, exclusion from office activities, assignment to a fallow sales territory and lack of supervisor support were found tolerable in *Harriston v. Chicago Tribune Co.*, 992 F.2d 697, 705 (7th Cir.1993). Similarly, a series of work restrictions including limited secretarial access, denial of a flex-time request, a bar on speaking to colleagues about non-work matters and truncated breaks were deemed tolerable in *Rabinovitz*, 89 F.3d at 489. Again, a work environment in which husband and wife plaintiffs were shunned, received harassing phone calls, discovered that someone had gone through papers in their work locker and were told once that their safety might be in jeopardy was found "unpleasant," but not intolerable. *Drake*, 134 F.3d at 886–87.

■ Most of Simpson's complaints fall into the relatively benign genre held insufficient to amount to constructive discharge in *Harriston*: a lack of support from a supervisor, a failure by her company to assign new employees to her shift, an alleged constraint on her ability to supervise a male subordinate, a colleague's failure to support her efforts to discipline subordinates and Ames's habit of scratching his genitals. Constructive demotion may not call for as severely intolerable working conditions as constructive discharge, but the two sorts of conditions are comparable. Here there seem to be two complaints sufficiently severe to require further discussion: Simpson's supervisor's delay in discharging a threatening employee, and

plaintiff's equipment was sabotaged in a way that jeopardized her safety on the job, she was excluded from required job functions, and was socially ostracized. *See id.* at 927. The court in *Sharp* affirmed a jury's finding that the "voluntary" transfer request was in fact an adverse employment decision, because it resulted from "conditions so intolerable that a reasonable person would feel compelled to leave." *Id.* at 934.

We note, however, one analytical difference between constructive discharge and constructive demotion. When one resigns because of unbearable working conditions, one is fully extricated from the agonizing situation. When one requests demotion, one may or may not obtain complete relief, depending on

the particulars of her reassignment. Therefore, the proximity of the demoted employee to the offensive work conditions might tend to offset evidence that prior conditions were "intolerable." Thus, in *Sharp*, where the plaintiff was transferred from the geographically isolated headquarters of the Mounted Patrol to the Police Academy, which was housed in a building separate and far away from the scene of her alleged anguish, she obtained complete relief from the situation she found intolerable. Here, it is unclear whether Simpson would be stationed near, or interact with, her former colleagues. Because we find no evidence the work conditions were intolerable, the question of subsequent proximity is unimportant here.

the aborted mandate that she take a basic skills test.

*Brooms, Taylor* and *Snider* suggest that a work environment posing grave threats to physical integrity may be intolerable. The plaintiff in *Brooms* received a pointed death threat. 881 F.2d at 423–24. The plaintiff in *Taylor* was held at gunpoint. 966 F.2d at 1191. The worker in *Snider* attempted suicide. 973 F.2d at 557. The record does not indicate that Simpson was in similarly grave peril. The details of the first threat she received are not specified. The employee's second threat was a remark to a co-worker that "someone should take a dish and knock [Simpson] upside the head." Appellant's App. Vol. I, Tab A at 129. There is some indication in the record that a piece of equipment in the plant was known as a "dish," but the record sheds no light on its size, weight or function, or whether Simpson understood the threat to involve plant equipment. Appellant's App. Vol. I, Tab A at 6. Without such information, the most liberal possible inference in Simpson's favor does not suggest that the threat was as grave or specific as the ones found "intolerable" in *Brooms, Taylor* and *Snider*. Moreover, Ames responded to the threats. He took no immediate action on the first threat because he mistakenly thought it unverifiable. At about the same time he learned he could verify the threat, the worker involved made a second threat. Appellant's App. Vol. II, Tab A at 49–57. Ames then fired her. This course of action shows an effort to protect Simpson in order to make her work environment tolerable; not the opposite.

Similarly, the mandate that Simpson pass a basic skills test, even when taken in the light most favorable to her, does not create an "intolerable" condition. Having previously taken and failed the test and nevertheless continued in her position, Simpson cannot argue that submitting to the same test a second time would be intolerably demeaning. Moreover, Ames did not condition her employment or her continuation in the Production Facilitator position on passing the test. Quite the opposite. He told her that if she did not pass the test initially, he would arrange for her to take classes (not in the company of her subordinates) to help her pass it. Again, this action shows an effort to make Simpson's work environment more, not less, tolerable.

██ In sum, Simpson has not shown that her multiple minor grievances and two substantive complaints created an intolerable work environment. Having failed to meet the first requirement for constructive demotion, it is irrelevant whether Simpson proved the second—discriminatory motivation for the challenged acts. For the record, there is no evidence that any of the acts Simpson complains of were gender-motivated, other than the fact that Simpson was the only female Production Facilitator at the facility at the time. The mere fact that she is a woman is insufficient to support an inference that the action was gender-motivated. *See, e.g., Rabinovitz*, 89 F.3d at 488. In any event, Simpson did not suffer constructive demotion or any other adverse employment action.

### III. Conclusion

Because Simpson failed to show an adverse employment action, she has not established a prima facie case of Title VII sex discrimination. Therefore, Borg–Warner need not explain its actions under the *McDonnell Douglas* test. Taking all facts in the light most favorable to Simpson, and drawing all reasonable inferences in her favor, there is no genuine issue of material fact requiring trial, and Borg–Warner is entitled to judgment as a matter of law. *See Vitug*, 88 F.3d at 511–12. The court below properly granted summary judgment for Borg–Warner, and the judgment is

AFFIRMED.