Sandra L. SHIRK, Plaintiff,

v.

BOWLING, INC., Defendant.

No. CIV. A. 99–C–581.

United States District Court, E.D. Wisconsin.

Nov. 13, 2000.

Russell C. Brannen, Jr., O'Neil, Cannon & Hollman, Milwaukee, WI, for Plaintiff.

Scott C. Beightol, Brenda S. Kasper, Michael Best & Friedrich, Milwaukee, WI, for Defendant.

## DECISION AND ORDER DATED GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

REYNOLDS, District Judge.

Plaintiff Sandra L. Shirk ("Shirk"), a former chief executive officer of defendant Bowling, Inc. ("Bowling"), alleges that she was unlawfully terminated on account of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended. Before the court is Bowling's motion for summary judgment, which the court grants.

## BACKGROUND [1]

The following facts are undisputed:

Bowling is a coordinator and facilitator for the development of planning processes and centralized marketing services for its business partners, which include the American Bowling Congress ("the ABC"), an organization which, until recently, was exclusively for men, with an all-male governing board; the Women's International Bowling Congress ("Women's Congress"), a women's association, with an all-female governing board; the Bowling Proprietors Association of America ("BPAA"), an organization of owners/operators of bowling centers, with an all-male governing board; the Young American Bowling Alliance; and United States of America Bowling. (DFOF ¶ 1; PFOF ¶¶ 1–4.) Bowling is governed by an eight-member board of directors ("Board") which includes individuals appointed by each of the business partners. (DFOF ¶¶ 3, 21.)

Single Delivery System ("SDS") is a non-profit division of Bowling which was created in 1996 to provide consolidated staff services for Bowling's business partners. (DFOF ¶¶ 2, 10.) Examples of these services include handling events and tournaments, providing oversight for bowling rules and regulations, providing organizational development such as human resource development training, and distributing membership cards. (DFOF ¶ 45.) SDS also provides financial services, such as preparing financial reports, allocating budget items, and helping create fiscal year budgets. (DFOF ¶ 46.)

---

1. The court must grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). All facts are considered in the light most favorable to the non-movant, and all inferences are resolved in the non-movant's favor. *See Simpson v. Borg–Warner Automotive, Inc.,* 196 F.3d 873, 876 (7th Cir. 1999).

The background facts are taken from the parties' proposed findings of fact. *See* Local Rule 6.05 (E.D.Wis.). When there is no objection to proposed findings of fact, the court accepts them as true. *See* Local Rule 6.05(d). The court will refer to Bowling's May 31, 2000 proposed findings of fact as "DFOF," and Shirk's July 14, 2000 proposed findings of fact as "PFOF."

The ABC was SDS's largest business partner, and the Women's Congress was SDS's second largest business partner.[2] (DFOF ¶¶ 47, 84.) The BPAA was also a significant financial supporter of SDS. (PFOF ¶ 14.) SDS was basically under-funded in its first two years; officials from both the ABC and the Women's Congress would not support additional funding for SDS. (PFOF ¶ 44.)

When SDS was created, the Board de-termined that it needed to hire a chief executive officer ("CEO") who would be accountable for the organizational success of SDS. (DFOF ¶ 12.) Shirk and two males were selected as finalists for the position. (DFOF ¶¶ 13-15.)

Shirk, then-executive director of the Women's Congress, was chosen as a final-ist because she was familiar with the bowl-ing industry, had a strong financial back-ground, had a masters degree in finance, and was a certified financial planner. (DFOF ¶ 16; PFOF ¶ 1.) Shirk's financial background was of fundamental impor-tance to her selection as a finalist because management of the financial area of SDS was considered a top priority by Board members, as the CEO would be responsi-ble for overseeing and managing the merg-ing of budgets and financial processes of the different business partners. A major goal of SDS was to achieve cost savings; the CEO would therefore be responsible for ensuring that the merger of the busi-ness partners was accomplished in a man-ner that achieved those cost savings. (DFOF ¶ 17.)

Ultimately, the Board voted unanimous-ly to hire Shirk for the CEO position be-cause of her strong financial background, her experience in the bowling industry, and her philosophy to provide customer-driven services to the business partners. (DFOF ¶¶ 6, 20, 22.) Shirk formally be-came SDS CEO on August 1, 1996; she remained in that position until January 20, 1998, when she was terminated. (DFOF ¶¶ 6, 24.) She reported directly to the Board, and was an at-will employee. (DFOF ¶ 25.) Shirk was ultimately re-sponsible for the financial management and performance of SDS as a whole. (DFOF ¶ 37.)

Before Shirk was hired, SDS staffing was decided, and its financial aspects and accounting software were set up. (PFOF ¶¶ 16-18, 22-23, 27-29, 33.) When SDS became operational on August 1, 1996, the business partners transferred the majority of their employees to SDS. (DFOF ¶ 42.)

In December 1996, Shirk hired Bud Kempen ("CFO Kempen") as controller of SDS; his title was changed to Chief Finan-cial Officer in July 1997. (DFOF ¶ 40; Pl.'s July 3, 2000 Resp. to DFOF ¶ 41; PFOF ¶ 94.)

By early 1997, Board members and the business partners were increasingly dissat-isfied with SDS's financial services because neither the Board nor the business part-ners were receiving accurate monthly fi-nancial reports in a timely manner. (DFOF ¶ 116.) The dissatisfaction of the Women's Congress with SDS's financial services began in spring 1997; the month-ly financial reports for the Women's Con-gress were often several weeks late during calendar year 1997, were often inaccurate, and SDS personnel could not provide an-swers to questions. (DFOF ¶¶ 90, 92, 94, 95.) Other business partners, the Young American Bowling Alliance and United States of America Bowling, were not satis-fied with the financial services they re-ceived from SDS during calendar year 1997.[3] (DFOF ¶ 108.)

---

**2.** The ABC's and the Women's Congress's boards of directors had a fiduciary obligation to their members to ensure that the operation of SDS was successful. Both organizations were financial lenders to SDS; if SDS failed, the organizations would lose the significant amount of money that they had loaned to SDS. (DFOF ¶ 48.)

**3.** The BPAA, another business partner, had not transferred its financial accounting or budgeting processes to SDS during fiscal year 1997. (DFOF ¶ 105.)

Frequently during the spring of 1997, Board member Roger Dalkin of the ABC ("Dalkin (ABC)"),[4] discussed with Shirk the ABC's concerns about SDS services, particularly the financial services. Shirk continually assured Dalkin (ABC) that, as CEO, she would fix the service problems. (DFOF ¶ 59.) In March 1997, Shirk and CFO Kempen went to an ABC committee meeting to discuss the ABC's concerns about SDS's financial services. Both Shirk and CFO Kempen assured the committee that services would be improved and that the monthly financial statements would be timely and accurate. (DFOF ¶ 63; May 31, 2000 Dalkin (ABC) Decl. ¶ 22.)

In March 1997, Jack Lederer, a Board member ("Board member Lederer"),[5] told Shirk that the Board was extremely concerned about the financial area of SDS. Board member Lederer told Shirk that she needed to get the "best and brightest" people on her staff so that SDS could soon start providing better financial services to the business partners. (DFOF ¶ 123.) Board member Lederer questioned Shirk about whether CFO Kempen had adequate skills and was competent to perform the position for which Shirk had hired him. Board member Lederer told Shirk to hire whatever talent was necessary to ensure that the financial area of SDS was managed effectively. (DFOF ¶ 123.) Board member Lederer also told Shirk that "the Board was '200% behind her' in her role as CEO of SDS." (DFOF ¶ 124.)

In May 1997, J.C. Higgins ("Higgins"), chairman of the ABC Finance and Budget Committee who was a certified public accountant, sent Board member Dalkin (ABC) a memorandum detailing Higgins's concerns with SDS's financial services.[6] In the memorandum, Higgins concluded that he could not rely on the monthly financial statements being provided by SDS; he was concerned about a fiscal year 1997 audit, because of the unreliable financial statements. (DFOF ¶ 60.) Dalkin (ABC) forwarded the memorandum to Shirk. (DFOF ¶ 61.) Shirk discussed the ABC's concerns with Dalkin (ABC) and assured him that, as CEO, she would fix the service problems. Dalkin (ABC) told Shirk to let him know if the ABC could provide any help to SDS to improve the service problems, and that the ABC would help in any way that it could. (DFOF ¶ 62.)

In May 1997, the ABC gave notice that it intended to withdraw from SDS, at least with respect to financial services; it did not act on the intent to withdraw.[7] (PFOF ¶ 99.)

In July 1997, as part of Shirk's ongoing review process for fiscal year 1997, Kurt Brose ("Brose"), the Board's director, asked Rick Bourgeois ("Bourgeois (BPAA)") and Charles Brehob ("Brehob (BPAA)"), both Board members and BPAA representatives, to give an evaluation of Shirk's performance as CEO. (DFOF ¶¶ 131, 135.) Bourgeois (BPAA) believed that CFO Kempen did not have the skills to adequately manage the finan-

---

**4.** Dalkin was the ABC's Assistant Executive Director from November 1989, to July 1997, at which time he became the ABC's Executive Director. Dalkin was on the Board from March 1995, to August 1, 1996, and from March 1997, to July 1999. (May 31, 2000 Dalkin Decl. ¶¶ 1–2.) Dalkin did not participate in any executive sessions of the Board from March 1997, to January 1998, so that any potential conflict of interest (between his role as an ABC employee and his role as a Board member) would be avoided. (DFOF ¶ 220.)

**5.** In June 1996, Lederer served as a consultant to the Board to assist in the design and

implementation of SDS. In August 1996, he was appointed as a non-aligned (i.e., he did not represent a business partner) Board member for two years, and was elected Board chair in July 1997.

**6.** A copy of the memorandum is attached as Exhibit A to the May 31, 2000 Dalkin (ABC) declaration.

**7.** The notice was apparently given to meet a technical requirement of an agreement between the ABC and Bowling. The nature of the notice is not developed by the parties in their proposed findings of fact.

cial functions of SDS because Bourgeois (BPAA), as the chairman of the Board's Finance and Planning Committee, had worked with CFO Kempen on numerous occasions. (DFOF ¶ 133.) Additionally, Bourgeois (BPAA) told Brose that Shirk was continually making excuses for the financial mismanagement of SDS but she was doing nothing to solve the problems that existed. (DFOF ¶ 134.) Brehob (BPAA) provided Brose with a memorandum that detailed Brehob (BPAA)'s concerns about Shirk's performance as CEO. (DFOF ¶ 136.) Brehob (BPAA)'s memorandum also discussed whether the Board should give Shirk the benefit of the doubt on certain problems that SDS was experiencing because of the difficult job of combining the different cultures of the business partners. However, Brehob (BPAA) determined that, even giving Shirk the benefit of the doubt for certain problems experienced by SDS, "Shirk had 'not been the leader that [Brehob (BPAA)] had hoped for.'" (DFOF ¶ 140.) Brehob (BPAA) indicated that the Board might want to consider planning a transition where Shirk would be replaced as CEO. (DFOF ¶ 142.)

Sometime during the late summer or early fall of 1997, Board member Brehob (BPAA) told Shirk to contact Peter Caprise ("Caprise") to ask him if he would be interested in providing financial management support to SDS or whether he would be interested in assuming the CFO position at SDS in place of CFO Kempen. (DFOF ¶ 143.) Brehob (BPAA) suggested that Shirk contact Caprise because he was a CPA, had been involved in financial management issues at SDS, and had been a bowling proprietor and understood the bowling industry. (DFOF ¶ 144.) Shirk apparently did not contact Caprise at this time.

During the Board's general session on September 11, 1997, the presentation by Shirk and SDS of the SDS business plan goals drew a standing ovation of the Exec-

utive Team. (PFOF ¶ 81.) It was also decided at this time that Shirk would receive an 18% bonus and a $10,000.00 raise; Board member Lederer informed Shirk that she had received an "Exceeds Expectations" rating, but at the low end. (PFOF ¶¶ 83, 88.) Board member Lederer also told Shirk that she would also be given the title "President," since there were various corporate and contractual issues where a division President designation for signature would be needed. (PFOF ¶ 86.)

By the Board's September 1997 meeting, Shirk knew the Board was unhappy with CFO Kempen's performance, and Shirk has admitted that she was unhappy with his performance by this time. (DFOF ¶ 154.)

During a Board meeting in October 1997, the Board continued to discuss the business partners' dissatisfaction with SDS's financial management. The Board even directed Bourgeois (BPAA), the Chairman of the Board's Finance and Budget Committee, to work with CFO Kempen to resolve what the content of business partner financial reports would be. (DFOF ¶ 155.) During the October meeting, the Board also dealt with Shirk's failure to provide the Board with the final audit for fiscal year 1997 within the time line required by the bylaws. (DFOF ¶ 156.) During the meeting, Shirk requested and was granted an extension until November 24, 1997, to provide the audit to the Board. The Board cautioned Shirk not to miss that November audit deadline. (DFOF ¶ 158; PFOF ¶ 138.)

In late November and early December 1997, the business partners and the Board learned that SDS had previously failed to set aside $323,290.00 for pension funding for the period from February 1, 1997, to July 31, 1997, and had failed prospectively to budget for the pension funding when calculating the fixed fees to be paid by the business partners in the budget for fiscal year 1998.[8] (DFOF ¶ 159.) Shirk's initial

---

8.  The Human Resources area of SDS was responsible for monitoring whether the pen-

sion funding had been properly budgeted. (DFOF ¶ 162.) Amy Smith ("HR Smith"), an

reaction in learning that this money had not been set aside was one of shock. (PFOF ¶ 164.) In early December 1997, Shirk called Board member Bourgeois (BPAA) to discuss the pension funding problem because he was the Chair of the Board's Finance and Budget committee. When Shirk told Bourgeois (BPAA) about the pension funding problems, she told Bourgeois (BPAA) that "it was the 'worst day' of her 'professional career.'" (DFOF ¶ 164.)

After the pension issue was discovered, Shirk told Board member Dalkin (ABC) that it was not a problem because the actual pension payment for fiscal year 1997 did not have to be made until September 1998. (DFOF ¶ 71.) Dalkin (ABC) was not satisfied with Shirk's response to the pension funding issue, however, because Dalkin (ABC) believed that SDS had failed to make the correct business decision to plan for the funding in the first place. He believed that the failure to account for the pension funding by SDS personnel established that SDS was not being appropriately managed by Shirk. (DFOF ¶ 72.) In a memorandum to Dalkin (ABC) dated December 9, 1997, Shirk detailed the steps that she promised SDS would take to fix the problems with the financial services being provided to the ABC.[9] (DFOF ¶ 73.) Shirk's promises to "fix" the problems in the memorandum were the same promises that she had been making to Dalkin (ABC) since the spring of 1997. Shirk's assurances to Dalkin (ABC) did not alleviate Dalkin (ABC)'s concerns about SDS because Dalkin (ABC) had not seen any improvement in the financial services being provided by those same SDS financial staff in recent months. (DFOF ¶ 74.)

The Board members were displeased by the fact that Shirk's staff had not noticed the pension funding problem until the end of November 1997, when that funding should have been considered and included in the budgeting process as early as February 1, 1997. (DFOF ¶ 168.) The Board members were also unhappy with the fact that Shirk's staff had discovered the pension funding problem after the Board had approved bonuses for SDS employees under an employee incentive plan, pursuant to which SDS employees were eligible for a bonus if SDS achieved certain cost savings goals. Because the $323,290.00 in pension funding had not been properly budgeted, Shirk's staff had mistakenly believed that there was extra money in the budget, and had assured the Board that the cost savings goals had been reached and that the bonuses should be paid out. (DFOF ¶ 170.) After the pension funding problem was discovered, the Board realized that SDS had not achieved its cost savings goals and that the bonuses should not have been paid to SDS employees. (DFOF ¶ 171.)

The results of an Arthur Andersen fiscal year 1997 audit report were provided to the Board during its December 11, 1997 meeting. (DFOF ¶ 172.) Board members were not pleased with the management letter from Arthur Andersen that was part of the audit report because it indicated numerous areas where SDS needed to improve its accounting practices. (DFOF ¶ 173.) Board member Bourgeois (BPAA) believed that the management letter from Arthur Andersen was a "scathing" indictment of the accounting practices of SDS. (DFOF ¶ 174.) David Bauer, the lead Arthur Andersen auditor, believed that many of the comments in the management letter, including the twenty-five proposed audit adjustments, were caused by the "sloppy" accounting practices in the financial area at SDS. (DFOF ¶ 177.)

SDS Vice President, was in charge of the SDS Human Resources area, and was responsible for ensuring that the pension funding had been properly budgeted; HR Smith reported directly to Shirk. (DFOF ¶ 163.) After learning of Shirk's termination, HR Smith was concerned that she would also be terminated because of the pension funding problem. HR Smith was never disciplined as a result of the pension funding problem. (DFOF ¶ 228.)

9. A copy of the December 9, 1997 memorandum is attached as Exhibit C to the May 31, 2000 Dalkin (ABC) declaration.

During Shirk's tenure as CEO, the Board was aware of the business partners' dissatisfaction with the services being provided to them by SDS because the business partners had complained to Board members. (DFOF ¶ 111.)

During the executive session of the Board's December 1997 meeting, the Board had an extended discussion of Shirk's performance failures as CEO. (DFOF ¶ 193.) Each Board member discussed his or her dissatisfaction with Shirk's performance. (DFOF ¶ 194.) The Board decided not to make a decision on whether to terminate Shirk during the executive session, but, instead, to schedule another executive session meeting in January of 1998 to reconvene its discussion of Shirk's performance. (DFOF ¶ 198.) The Board's decision to delay further discussion of Shirk's performance for another month gave Board members additional time to reflect and consider Shirk's performance as CEO. (DFOF ¶ 199.) The Board also decided that it needed to hire a more qualified CFO than CFO Kempen. (DFOF ¶ 201.) When the Board reconvened its general meeting, the Board notified Shirk that her authority to hire a CFO had been revoked, and that she was directed to hire Caprise as the new CFO. (DFOF ¶¶ 202–03; PFOF ¶ 193.)

Shirk offered the CFO position to Caprise, which he accepted and assumed in January 1998. (DFOF ¶¶ 204–05; PFOF ¶ 197.) Shirk notified CFO Kempen that he was going to be downgraded to Controller, with Caprise becoming the CFO, because additional help was needed in SDS's financial area. (DFOF ¶ 206.) When Caprise became CFO, he discovered that the financial area of SDS was in disarray. (DFOF ¶ 207.)

By letter dated December 22, 1997, Shirk responded to the ABC's concerns about SDS's financial area, and provided her plan to rectify the ABC's concerns. In the letter, Shirk told Board member Dalkin (ABC) that the ABC's concerns were valid and reiterated the promises contained in her December 9, 1997 memorandum.[10] (DFOF ¶ 81.)

During all of calendar year 1997, Dalkin (ABC) had discussed the ABC's concerns about SDS services with Roseann Kuhn, the Executive Director for the Women's Congress ("Kuhn (Women's Congress)"). The Women's Congress shared the ABC's concerns about the financial services provided by SDS. (DFOF ¶ 82.) Kuhn (Women's Congress) and Dalkin (ABC) drafted a memorandum, dated January 5, 1998, to Shirk on behalf of both the ABC and the Women's Congress that detailed the concerns of both organizations.[11] (DFOF ¶¶ 83, 100–01.) The memorandum provided detailed bullet points that described the problems that both the Women's Congress and the ABC had experienced with SDS. (DFOF ¶ 102.) The memorandum notified Shirk that if she did not address problems in the service levels provided to the Women's Congress and the ABC by February 19, 1998, the Women's Congress and the ABC would take its concerns directly to the Board. (DFOF ¶ 83.)

The Board reconvened its executive session discussion of Shirk's performance as CEO on January 5, 1998. (DFOF ¶ 213.) Each Board member again discussed his or her dissatisfaction with Shirk's performance. (DFOF ¶ 214.) The general consensus of the Board members was that they were not satisfied with Shirk's performance for all of the reasons that they had discussed during the December meeting. (DFOF ¶ 215.) In particular, the Board was frustrated that, despite repeated encouragement to improve the services being provided to the business partners, Shirk had failed to take leadership responsibility for fixing the problems. In addition, the Board was concerned that Shirk had failed to hire a more qualified CFO until the

---

10. A copy of the December 22, 1997 letter is attached as Exhibit E to the May 31, 2000 Dalkin (ABC) declaration.

11. A copy of the January 5, 1998 memorandum is attached as Exhibit F to the May 31, 2000 Dalkin (ABC) affidavit.

Board had stepped in and acted for her. (DFOF ¶ 216.) After the discussion, the Board unanimously voted to terminate Shirk. (DFOF ¶ 217.) The Board's decision to terminate Shirk was a difficult one because Board members had developed a personal relationship with Shirk and had wanted her to succeed. (DFOF ¶ 221.)

After Shirk was terminated, the Board decided to create a new management structure for SDS. It created a Senior Executive Leadership Team, comprised of a Chief Operating Officer (which individual had been Shirk's interim replacement), Chief Information Officer, and Chief Financial Officer. (DFOF ¶¶ 229–230; PFOF ¶¶ 207, 210.)

## DISCUSSION

### Shirk's Theory of the Case

Shirk contends that the Board chose to terminate Shirk because SDS's male business partners (primarily the ABC and the BPAA) wanted Shirk removed from her position because she is female. While Shirk's brief is replete with statements that declare this is what happened,[12] there is no specific development in her brief, and there are no facts proposed by her, as to how the male business partners went about applying unjustified pressure on the Board to fire Shirk.

### Shirk's Direct Evidence of Discrimination

■ Shirk claims to have direct evidence of Bowling's sex discrimination, consisting of the following:

1. Gerald Tessman ("Tessman"), a Board director and ABC representative, contacted Shirk to offer her the position. (PFOF ¶ 5.) Prior to contacting Shirk, Tessman prepared notes of what he was going to say to Shirk.[13] (PFOF ¶ 6.) Shirk proposes that Tessman told her that, at the instruction of the Board, she should prepare a "Damage Control Plan," because of possible negative reaction to her being hired—specifically, that the ABC and the BPAA were expecting a male to be appointed.[14] (PFOF ¶¶ 7–10.) Shirk states, with no evidentiary support, that "the 'Board instruction' was clear: if you can't overcome the male customer-organizations' resistance to a female CEO, you'll be gone." (Pl.'s July 3, 2000 Br. at 8.)

2. Tessman now claims that he was acting on his own, rather than at Board direction.

3. The Board's reliance on undocumented complaints (not specified in Shirk's discussion of direct discrimination) from sources it admits were biased against females.

These circumstances, however, do not constitute "direct evidence" of discrimination. With respect to Tessman's comments at the time Shirk was hired, they lack both a temporal relationship to, and a causal nexus with, the Board's decision to terminate Shirk. *Fortier v. Ameritech Mobile Communications, Inc.*, 161 F.3d 1106, 1111 (7th Cir.1998). As to Tessman's after-the-fact explanation regarding why he told Shirk to come up with a

---

12. The following are examples:
   "[E]vidence (and inferences therefrom) supports that [the male organization business partners'] griping led to her replacement collectively by three males."
   "[A]fter a series of events that appeared momentarily to be critical but were soon demonstrated to be otherwise, the Board abruptly reversed position in the face of unabated attacks led by the male customer organizations."
   "As the Caprise January memo shows [the memo is not discussed by Shirk in her brief], the real source of contention threatening Shirk was ABC and its minions."

(Pl.'s July 3, 2000 Br. at 4, 11, 26.)

13. A copy of the notes, entitled "Board Instructions," is attached as Exhibit A to July 3, 2000 Shirk declaration.

14. The note states, with respect to the "Damage Control Plan":

   Damage Control Plan
   re: Possible neg reaction
   — Employees
   — ABC Board
   — BPAA Board
   — Media

"Damage Control Plan," and the Board's consideration of business partner complaints, these circumstances are more appropriately considered as indirect evidence.

### Shirk's Indirect Case of Discrimination

 With respect to Shirk's indirect case of discrimination, the court will, rather than determine whether Shirk can establish her prima facie case, look to whether Bowling's explanations for terminating Shirk are pretextual. *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998). To show that Bowling's reasons are a pretext for sex discrimination, Shirk must show that the reasons are lies; whether the reasons are erroneous or poor business judgments is insufficient. *Id.*

Shirk's principle arguments regarding pretext are that (1) in September 1997, the Board gave Shirk a positive evaluation, bonus, raise, and the title of President, which Bowling explains was meant to encourage Shirk, but there is no evidence that it was communicated to Shirk that these actions were taken to encourage her; (2) HR Smith and CFO Kempen had more direct responsibility for the pension funding issue, and they were not terminated (*see* PFOF ¶ 206); (3) the problems cited by the Board are overblown or not Shirk's responsibility; and (4) Shirk was replaced by one male interim CEO, then three males making up a Senior Executive Leadership Team.[15]

These arguments simply do not rest on sufficient facts for Shirk to show that Bowling's reasons for terminating her are pretextual. As the undisputed facts discussed above in the background section show, the business partners were dissatisfied at least in part with SDS's financial services, and the Board had significant concerns, and was disappointed, with Shirk's performance. The Board chose to blame Shirk for SDS's failures in providing services to the business partners. Wheth-

er this choice was fair is not for the court to decide. There is insufficient evidence to support an inference that the Board did not believe that Shirk had failed as CEO, and that Shirk was terminated because of her sex. Bowling's motion for summary judgment will therefore be granted.

### CONCLUSION

Defendant Bowling, Inc.'s motion for summary judgment is **GRANTED**.

Defendant Bowling, Inc.'s motion to strike is **DENIED AS MOOT**.

This action is **DISMISSED**.

---

15. Shirk basically ignores facts which support Bowling's position that sex was not a factor in the decision to terminate Shirk, e.g., HR Smith, a female who was responsible for budgeting the pension funding, was not terminated; and the Women's Congress, and not just the male business partners, had concerns about SDS's performance.