Lori K. **TEYMER**, Plaintiff–Appellant,

v.

**KRAFT FOODS NORTH AMERICA, INC.,** Defendant–Appellee.

No. 01–2018.

United States Court of Appeals, Seventh Circuit.

Argued April 15, 2002.

Decided May 20, 2002.

Before CUDAHY, DIANE P. WOOD, and EVANS, Circuit Judges.

### ORDER

Lori Teymer filed this suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, alleging that during her employment with Kraft she was the victim of sex discrimination. She also claimed that when she complained about it, Kraft retaliated against her. The district court, Judge Barbara Crabb, granted Kraft's motion for summary judgment, a decision we review *de novo* on Teymer's appeal. *Smith v. Sheahan*, 189 F.3d 529 (7th Cir.1999).

Teymer was employed at a Kraft Foods' facility in Madison, Wisconsin, between 1991 and 2000. In Madison, Kraft produces things like Oscar Mayer meat products—hot dogs, bacon, ham, and the like.

Kraft uses annual performance evaluations, which rate an employee's "overall performance," by the following standards: (1) unacceptable performance; (2) marginally meets performance requirements; (3) fully meets performance requirements; (4) exceeds performance requirements; or (5) significantly exceeds performance requirements. Each year until 1997 Teymer received overall performance ratings of "fully meets" requirements. She received similar comments each year about areas in which she needed to improve, such as team leadership, initiative, positive attitude, and building and sustaining relationships.

In 1996, at her own request, Teymer transferred to the "turkey bacon" department, and in early September of that year she became a production supervisor. Her supervisor, Brice Link, saw deficiencies in her work and talked with her about them. On at least one occasion Link mentioned these performance issues at the weekly meeting of managers, one of whom was

Brad Eilrich. In May 1997, at a meeting at which Link and Eilrich were both present, it was determined that because of Teymer's performance deficiencies in production, and because of the need for a supervisor in distribution, she would be returned to distribution. She would be required to implement a new elevator management system that was scheduled to start the next year. When Teymer was informed of the transfer, she "vehemently objected" and began crying. She told Link that she did not want to return to the distribution department. She would be the only female supervisor in distribution and would be required to work with at least two supervisors about whom she had previous complaints.

Link completed a 1997 mid-year review for Teymer that stated in part that she had struggled to meet the expectations and had been counseled on several issues that need attention. He said she was capable of producing quality work but had a difficult time communicating to her peers and superiors. Further, he said Teymer needed to learn to develop good working relationships and build trust with her subordinates.

In June 1997 Teymer met with Eilrich about her return to distribution, which was to take place the following week. Eilrich told her that her job performance as a production supervisor had been unsatisfactory, that she was being given a chance to prove herself, but that if she did not perform satisfactorily she would be terminated. Teymer said she felt intimidated and harassed at this meeting because Eilrich spoke with her from a distance of only 4 feet without any furniture between them.

There were seven distribution supervisors, and Teymer was the only woman. She disliked at least five of the others, but mainly she was concerned about working with Eilrich and Pete Schumacher, a supervisor on the second shift.

Shortly after Teymer returned to distribution, Eilrich noticed performance deficiencies, which he discussed with her almost weekly between June and October 1997. Teymer does not believe that her performance was a problem or that Eilrich's criticisms of her were valid.

Teymer complained to someone in the human resources department about the "snake pit" atmosphere in distribution, which she meant as a reference to sex discrimination. She said she was having the same problems with her peer supervisors as she had experienced during her first tenure in distribution, and she complained that Eilrich refused to address her concerns.

Eilrich again had a lengthy discussion with Teymer about her performance deficiencies. He gave her the option of taking a voluntary reassignment to one of the other shifts that he considered easier and potentially more manageable. She blamed others for the deficiencies Eilrich pointed out, a response that was unacceptable to him. Eilrich believed the deficiencies were real. Teymer believed the criticisms were insincere and discriminatory. She thinks Eilrich was looking for someone to blame for the failure of a new elevator management system and had decided that she would be the one to take the blame because she was a woman.

Her return to the distribution department caused her to suffer depression which would last throughout the next year. Her emotional state interfered with her job performance, and she concluded that she was unlikely ever to be capable of satisfying Eilrich's job expectations.

In the fall of 1997 Teymer again met with human resources people. She complained about her negative performance

review and stated that she was having trouble dealing with Eilrich, some of her peer supervisors, and her work environment. She explained that it was difficult being the only female supervisor in distribution and that she was considering transferring to the defendant's corporate offices, an entity separate from the manufacturing plant.

At a second meeting with people from human resources, Teymer described her work environment as "not a woman friendly environment." She said that "a woman doesn't get the cooperation that a man gets"; and "no matter how well a woman performs, it won't be at a man's level." During the meeting Teymer was asked numerous times whether she acknowledged having any performance deficiencies. She either refused to answer or avoided the question.

Also that fall, Eilrich began supervising Teymer more closely. On an almost weekly basis he met with her, criticized her performance, and wrote memos to her file. Because of this "close supervision," Teymer began taking off "mental health days," sometimes 2 or 3 in a row. In October 1997 Eilrich issued Teymer an "attendance warning."

More than once in November 1997, Eilrich and Teymer met to discuss her performance. Teymer believed that Eilrich's criticisms were based on inaccurate information that Schumacher provided to Eilrich. Eilrich told Teymer that although she had shown some improvement, she still had not exhibited a sufficient level of leadership. Effective January 5, 1998, he reassigned her from first to second shift where she would supervise fewer employees and would be responsible for a smaller portion of the overall workload. At the same time, Eilrich transferred Schumacher from second to third shift because of his performance deficiencies. Teymer's de-

pression lessened after her move from first to second shift. Eilrich continued to be her supervisor, but his shift overlapped with hers for only an hour or two a day.

The following four incidents form the basis of Teymer's Title VII action:

The first is a negative year-end performance review in 1997. Eilrich rated her performance as "marginal." He identified several areas in which Teymer needed to improve: team leadership, building and sustaining relationships, and execution. Teymer does not acknowledge these deficiencies. She believed Eilrich used inaccurate and distorted records to document false deficiencies. Quite expectedly, Eilrich disagreed.

After receiving the review, Teymer met with plant manager Hal Smith and told him that the work environment was as unsupportive as it had been from 1993 to 1996 during her first tenure in distribution. Smith told her that he would talk to Eilrich about her concerns and that women sometimes need to be managed more sensitively than men, a comment Teymer did not perceive as derogatory. She believed Smith was sympathetic to her concerns.

Another meeting was held, this time attended by Teymer, Eilrich, and Smith. Smith and Eilrich both told Teymer that she could perform acceptably, but only if she reversed her "negative attitude" and took "full responsibility for turning her career around."

Teymer's second complaint involves Eilrich's "close supervision" of her. Teymer believes the close supervision was unwarranted, consisted almost exclusively of negative criticism with virtually no praise or encouragement, was intentionally intimidating, relied upon false reports from her peer supervisors, was not applied to male supervisors, continued even after plaintiff justified her actions to Eilrich, and was

based upon Eilrich's failure to understand the new elevator management system and the operations of the distribution department.

Her third complaint involved a 30–day notice, which Eilrich gave her on March 25, 1998. Eilrich told her that many of her performance deficiencies had not been corrected and that she would be terminated if she did not improve significantly in the next 30 days. The 30–day notice had no effect on the terms and conditions of her employment, although it would remain in her file and might be considered by a prospective hiring manager if she were to apply for a different position in the plant. She believed that she was being made a scapegoat for the failure of the elevator management system. Her depression worsened, and on March 27, 1998, she took a leave of absence on the recommendation of her health care provider.

In April 1998 she applied for benefits under the defendant's disability plan for salaried employees, which includes both short-and long-term disability benefits. The standard for receiving benefits for the first 24 months under the disability plan was that she was "continuously unable to perform the material and substantial duties" of the job she was performing when she became disabled. For 14 weeks Kraft paid short-term disability benefits—100 percent of her regular annual salary of $40,900. For the next 12 weeks Kraft paid 66.6 percent of her regular annual salary. In late September 1998 Teymer received a letter advising her that her short-term benefits had expired and that she was expected to return to work. She did not return to work, but effective October 5, 1998, she was approved for long-term disability benefits in the amount of 50 percent of her base pay as of the date she last worked. She received monthly checks for that amount for over a year through Octo-

ber 31, 1999. In May 1999 she had moved to Conover, Wisconsin, near the Wisconsin–Michigan border.

After her last day of work on March 27, 1998, Teymer never made any attempt to return to work, which leads to her fourth and final complaint, her termination. Her lawyer contacted Kraft for the first time by letter dated July 27, 1998, stating that Teymer was "interested in negotiating terms for severing her employment ... and settling her potential claims without instituting legal action." Another letter in September said that Teymer would be willing to settle her claims and resign from employment for a specified sum of money.

Teymer was not willing to return to Kraft's Madison plant except under the following conditions: (1) she would have a new position in a department in which she did not have contact with the distribution department or with Eilrich, Schumacher, or other distribution supervisors whom she disliked; (2) her record would be cleared (at a minimum by removing the 30–day notice); and (3) she would "get [her] reputation back." Teymer refused to work in a position in which she might come into contact with any distribution employees.

In October 1999 her long-term disability benefits were terminated because Kraft's group benefits provider determined that she could perform her job. She appealed, contending that she was still disabled. In support of her appeal, she submitted a statement dated December 17, 1999, written by her mental health therapist, Donna Morrissey, stating that Teymer could not return to work for Kraft "without a recurrence of her severe depression," though she was ready to return to work for employers other than Kraft. Morrissey stated that Teymer's depression had been the result of the harsh management style she encountered at the plant as evidenced by "critical, threatening, disrespectful com-

ments," and "the use of a lot of negativity with her." Teymer's appeal was denied.

By letter dated December 8, 1999, Kraft made an unconditional offer for Teymer to return to work as a production supervisor in the "ham slice" department, assuring her that there would be no discrimination or retaliation against her. This position was identical to her former position in terms of benefits and promotional opportunities and was also on second shift, with a base salary of $43,400, $2,500 more than Teymer was earning when she began her disability leave. The position was in a different department from all of the employees about whom she had complained.

Teymer rejected the offer, saying she was "medically unable to return to work at Kraft in any capacity at this time." Teymer said she rejected the position because it was on second shift instead of first, because she would still be under the 30–day notice, and because she could not emotionally tolerate coming into contact with certain people in the distribution department.

In January 2000 Kraft renewed its unconditional job offer. The next month, Kraft sent another letter asking Teymer to return to work, again reassuring her that she would not be subject to retaliation or discrimination. The letter also said that if she did not report to work by February 14, 2000, she would be terminated. Teymer didn't return, and this suit was filed.

Teymer's sex discrimination claim rests, in part, on a contention that a similarly situated male employee was treated better than she was. That employee was Schumacher, who worked for Kraft for 24 years. On his 1997 year-end review, Schumacher was given a "marginal" performance rating. Later, Eilrich raised the rating to "fully meets" when he learned that Schumacher wanted to transfer from the plant into the corporate offices. Eilrich drafted numerous memos regarding Schumacher's performance, including his use of vulgar, demeaning, and threatening language in the workplace. Schumacher was transferred from second to third shift at the same time that Teymer was transferred from first to second shift. Eilrich gave Schumacher three "final" warnings regarding his job performance in March 1998, the same month in which Teymer was given her 30–day warning. Schumacher was not given a 30–day termination warning but was given a "resign or be fired" ultimatum on April 10, 1998. He resigned in May 1998. Teymer believes that Kraft fired Schumacher in an attempt to hide the fact that she was given critical performance reviews because she is a woman.

Plaintiffs in Title VII cases can prevail on the basis of direct or indirect evidence. Direct evidence is evidence which "if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Randle v. LaSalle Telecomms.*, 876 F.2d 563, 569 (1989); *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir.1997). Statements revealing discriminatory attitudes can be considered direct evidence when they are made by a decisionmaker and related to the employment decision at issue. *Stopka v. Alliance of Am. Insurers*, 141 F.3d 681 (7th Cir.1998); *Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096 (7th Cir. 2001).

■ Teymer contends that she presented direct evidence of discrimination in the form of a remark attributed to Eilrich by former sanitation worker John Sathre. In an affidavit, Sathre said he overhead the remark "about three years ago." He heard "something to the effect" that "it's a man's world and girls just aren't going to make it here." The remark is unfortunate. It does not, however, meet our require-

ments for direct evidence. The statement is not about Teymer specifically. The timing is not certain. Sathre testified at his deposition that he had no idea when the comment was made. There is nothing which puts Eilrich's remark contemporaneous to Teymer's problems or links it to the employment decisions at issue. We will move on to Teymer's indirect evidence.

To present a case of sex discrimination based on indirect evidence under *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), Teymer must show that she was a member of a protected class, that she was qualified for the job or that she was meeting her employer's legitimate performance expectations, that she suffered an adverse employment action, and that the employer treated similarly situated person not in the protected class more favorably that it treated her. *Simpson v. Borg–Warner Automotive, Inc.,* 196 F.3d 873 (7th Cir.1999). If she presents a prima facie case, Kraft must then produce evidence that the alleged discriminatory act was taken for legitimate, nondiscriminatory reasons. If Kraft is successful, then Teymer must demonstrate that Kraft's reasons are pretextual. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

■ Teymer's indirect evidence also fails. There was a good deal of evidence, for instance in the form of performance reviews, that Kraft was not satisfied with her performance. Cleverly turning that evidence on its head, however, Teymer contends that the unsatisfactory performance reviews and the close supervision of her were themselves adverse employment actions; in other words, the fact that Kraft showed dissatisfaction with her performance was an adverse employment action. But employee evaluations are not adverse employment actions. *Bragg v. Navistar*

*Int'l Transp. Corp.,* 164 F.3d 373 (7th Cir. 1998). Adverse employment actions are things like the termination of employment (which, in Teymer's case, we shall return to later), demotions involving a decrease in wages or salary, or a material loss of benefits. *Fortier v. Ameritech Mobile Communications, Inc.,* 161 F.3d at 1112. In the ordinary case, we quite naturally want to stay out of the business of second-guessing employee evaluations or the degree to which an employee needs to be supervised. Not every unpleasant aspect of employment can be remedied by federal laws.

We also question whether Teymer has shown that Schumacher, her example of a similarly situated male, was treated better than she was. Looking simply at the termination (which indisputably qualified as an adverse employment action), we cannot see how Teymer could establish that Schumacher was treated better than she was. She was terminated when she did not return from disability leave and did not take the job she was offered in the "ham slice" department. He was forced to resign to avoid being fired after 24 years of service. The circumstances are not directly parallel, but it is hard to conclude that difference somehow adds up to his firing being better than Teymer's termination.

■ Teymer's claim that her termination was retaliatory faces other obstacles. The first is procedural. Every Title VII case must commence with filing of a charge of discrimination before the Equal Employment Opportunity Commission and the subsequent issuance of a Notice of Right to Sue. 42 U.S.C. § 2000e–5. Teymer's charge before the agency was filed on September 28, 1998, and said that Kraft provided her with negative performance evaluations, denied her a bonus and pay raise, closely supervised her, and then it provided her with a warning letter. Here,

Teymer contends that her termination was the result of sex discrimination and was retaliatory. She was terminated in February 2000 and she did not file a separate charge alleging retaliation. As she points out, however, sometimes the fact that a separate charge has not been filed would not be fatal. In *McKenzie v. Illinois Department of Transportation,* 92 F.3d 473 (7th Cir.1996), we discussed the downside of requiring a separate charge for retaliation claims. What we determined, however, is that although a separate charge is not always required, if a court is to consider a claim of retaliation which is not found in a charge filed with the agency, there must be a "reasonable relationship" between the allegations against [the employer] found in the charge and the allegations of the complaint. At 482. Teymer argues that her termination is related to and grows out of the September 1998 charge of discrimination; she complained about her treatment at Kraft and ultimately she was terminated. However, the connection is too attenuated. We believe it still must "at minimum, describe the same conduct and implicate the same individuals." *Cheek v. Western & Southern Life Ins. Co.,* 31 F.3d 497, 501 (7th Cir.1994). In Teymer's case, the alleged sex discrimination she complains of and the reason for her termination are clearly distinct. When she was terminated she was on disability leave; she did not return to work when she was offered a position. Therefore, she was terminated. The decision to terminate her was not made by the person who allegedly discriminated against her in regard to employee evaluations, etc.

This brings us to another problem with the retaliation claim. We have recently clarified the requirements for summary judgment in the context of retaliation claims. For those claims based on the *McDonnell Douglas* framework, we said that the plaintiff must show that

after filing the charge only he, and not any similarly situated employee who did not file a charge, was subjected to an adverse employment action even though he was performing his job in a satisfactory manner. If the defendant presents no evidence in response, the plaintiff is entitled to summary judgment. If the defendant presents unrebutted evidence of a noninvidious reason for the adverse action, he is entitled to summary judgment.

*Stone v. City of Indianapolis Pub. Utils.,* 281 F.3d 640, 2002 WL 234239 (7th Cir. 2002). In this case, Kraft has presented evidence that Teymer was terminated because she refused to return to work. As Judge Crabb found, Teymer "had no reason to doubt that her failure to return to work was the reason for her termination." That an employer refuses to return to work is a noninvidious reason for termination. In this case, the payment of disability leave severs the connection between the alleged discrimination and the termination. *See, e.g., Lewis v. Holsum of Fort Wayne,* 278 F.3d 706 (7th Cir.2002).

For all these reasons, the judgment of the district court is AFFIRMED.