DIAZ, Circuit Judge:
 

 J.D. is a child on a strict gluten-free diet. In keeping with this diet, he attempted to bring a homemade, gluten-free meal into a restaurant while on a school field trip to Colonial Williamsburg. The restaurant refused to let him do so and offered instead to prepare him a gluten-free meal. But J.D. declined because he didn't trust the restaurant to safely prepare the meal to his specific needs. Ultimately, J.D. chose to eat his homemade meal outside and apart from the rest of his classmates.
 

 After these events, J.D., by his father and next friend, sued the Colonial Williamsburg Foundation (which owns and
 operates the restaurant) for violating the Americans with Disability Act, the Rehabilitation Act, and the Virginians with Disabilities Act. J.D. alleged that he is a person with a disability, and that Colonial Williamsburg discriminated against him by excluding him from the restaurant and by refusing to modify its policy against outside food. The district court granted summary judgment to Colonial Williamsburg. For the reasons that follow, we vacate and remand for further proceedings.
 

 I.
 

 A.
 

 J.D. is an 11-year-old boy who suffers from several health problems.
 
 [1]
 
 J.D. experiences a host of symptoms when he ingests gluten, including significant constipation, abdominal pain, foot pain and numbness, cognitive impairment, elevated liver enzymes, and temporary loss of consciousness. According to J.D.'s primary physician, J.D.'s family history is positive for either celiac disease or non-celiac gluten sensitivity.
 

 Celiac disease is an autoimmune disorder where the ingestion of gluten, even in trace amounts, causes damage to the small intestine. Symptoms include fatigue, abdominal pain, constipation, and cognitive impairment. Untreated, celiac disease can lead to additional serious health problems, including intestinal cancer, short stature, liver disease, and nervous system disorders such as seizures and migraines. Non-celiac gluten sensitivity is a disorder with similar symptoms.
 

 The only medically accepted treatment for celiac disease or non-celiac gluten sensitivity is a strictly gluten-free diet. J.D.'s physician expressed his medical opinion that "a gluten free diet is medically necessary for J.D." J.A. 165. And J.D.'s parents testified that his health significantly improved once on a strictly gluten-free diet.
 

 However, when J.D. "accidentally ingests gluten, even in trace amounts, his symptoms come crashing back." J.A. 111. According to his parents, J.D. has had adverse reactions when eating out at several restaurants. For example, during a family visit to Disney World, J.D.'s parents spoke with a restaurant manager, who went through an "exhaustive list of the protocols" that would be used to ensure a gluten-free meal.
 
 Id.
 
 at 289. J.D. ate a gluten-free pizza that came out on a different colored tray, with allergy stickers on it, and was carried by the manager. A few days later, J.D. experienced symptoms consistent with having ingested gluten. His family later learned that J.D. had in fact been served a wheat crust, not a gluten-free one.
 

 On other occasions, J.D. and his family frequented a restaurant that represented it could prepare gluten-free meals. J.D. would order gluten-free items from the menu, but after each visit, his family noticed that J.D. wasn't feeling well and showed signs of having ingested gluten. They didn't suspect the restaurant, however, because they had been assured of the gluten-free protocols in place. But on their last visit to the restaurant, they noticed a regular noodle in the purportedly gluten-free pasta.
 

 Following these and other incidents, J.D.'s parents resolved to provide medically safe food to J.D. To that end, they regularly prepare his food and pack separate tableware to ensure that he can participate in school parties, celebrations, and meals to the greatest extent possible. Although there are some restaurants that his
 parents still trust, in general, they no longer eat out as a family due to the risk of gluten exposure.
 

 B.
 

 This case has its genesis in a school field trip. On May 11, 2017, J.D. and his classmates, accompanied by teachers and parent chaperones (including J.D.'s father) traveled to Colonial Williamsburg. Colonial Williamsburg bills itself as a "living-history museum" consisting of original and reconstructed buildings from the 18th century. The historic area includes Shields Tavern, a restaurant owned and operated by the Colonial Williamsburg Foundation, which offers guests a traditional, 18th-century experience with costumed actors and musicians. The itinerary for the trip included dinner at Shields Tavern.
 

 Shields Tavern has a policy against allowing outside food into its restaurant. This policy is subject to two general exceptions: (1) parents may bring baby food or snacks for infants and toddlers, and (2) patrons may bring cakes and wine for events subject to a plating and corkage fee. Shields Tavern also appears to allow outside food at the discretion of the manager.
 

 Months before the trip, J.D.'s father informed the school that he and J.D. wouldn't be eating at any of the restaurants but would instead bring their own food. Nothing in the record indicates that this message was relayed to Shields Tavern. On the contrary, an invoice from Colonial Williamsburg shows that the school placed an order for two gluten-free meals at Shields Tavern. The parties dispute whether these meals were intended for J.D. and his father.
 
 [2]
 

 When J.D. and his father arrived at Shields Tavern, they sat down at a two-person table. J.D's father informed a waitress not to bring out any food for them.
 
 [3]
 
 He then unpacked a cooler filled with plates, cups, and utensils, and began making a gluten-free chicken sandwich. Another waitress told J.D.'s father that he couldn't bring in outside food because it was a health code violation.
 
 [4]
 
 J.D.'s father asked to speak to the manager, who confirmed the policy, and insisted that they would have to eat their food outside. The head chef soon arrived and offered to prepare a gluten-free meal for J.D.
 
 [5]
 

 At this point, J.D. and his father were left with three options: hope for the best and accept the restaurant's offer of a gluten-free meal, stay inside and not eat, or eat the prepared meal outside. As J.D. began to cry, his father packed up the prepared meal and followed a server outside to the picnic tables behind Shields Tavern. J.D. and his father ate outside for
 20 or 30 minutes before returning to the restaurant.
 

 C.
 

 J.D., by his father and next friend, filed suit against the Colonial Williamsburg Foundation alleging violations of Section 504 of the Rehabilitation Act, Title III of the Americans with Disabilities Act ("ADA"), and the Virginians with Disabilities Act. He alleges that Colonial Williamsburg discriminated against him by excluding him from Shields Tavern and by failing to modify its policy against outside food.
 

 Following discovery, Colonial Williamsburg moved for summary judgment. The district court referred the motion to a magistrate judge, who recommended granting it. The magistrate judge found that there was a genuine dispute of material fact as to whether J.D. is disabled within the meaning of the ADA. But the judge ultimately recommended granting summary judgment because J.D. didn't meet his burden to show that he was discriminated against because of his disability.
 

 The district court adopted the magistrate judge's recommendation and granted summary judgment to Colonial Williamsburg. The court also awarded costs to Colonial Williamsburg as the prevailing party. This appeal followed.
 

 II.
 

 "We review de novo a district court's summary judgment order."
 
 Reyazuddin v. Montgomery County
 
 ,
 
 789 F.3d 407
 
 , 413 (4th Cir. 2015). In doing so, we apply the same legal standards as the district court, viewing all facts and drawing all reasonable inferences "in the light most favorable to the non-moving party."
 
 Dulaney
 
 , 673 F.3d at 330. We do not weigh conflicting evidence or make credibility determinations.
 
 Reyazuddin
 
 ,
 
 789 F.3d at 413
 
 . If there are genuine issues of material fact that can only be resolved by a factfinder, then the motion for summary judgment must be denied.
 

 Id.
 

 "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party."
 
 Dulaney
 
 , 673 F.3d at 330.
 

 In this case, we view the evidence under the legal standards set forth in the ADA.
 
 [6]
 
 Congress enacted the ADA "to remedy widespread discrimination against disabled individuals, "
 
 PGA Tour, Inc. v. Martin
 
 ,
 
 532 U.S. 661
 
 , 674,
 
 121 S.Ct. 1879
 
 ,
 
 149 L.Ed.2d 904
 
 (2001), and to "provide clear, strong, consistent, enforceable standards" addressing that discrimination.
 
 42 U.S.C. § 12101
 
 (b)(2). Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."
 
 42 U.S.C. § 12182
 
 (a).
 

 To prevail under Title III of the ADA, a plaintiff must show that: (1) he is disabled within the meaning of the ADA;
 

 (2) the defendant owns, leases, or operates a place of public accommodation; and (3) the defendant discriminated against him because of his disability.
 
 See
 

 Ariz. ex rel. Goddard v. Harkins Amusement Enters., Inc.
 
 ,
 
 603 F.3d 666
 
 , 670 (9th Cir. 2010) ;
 
 Camarillo v. Carrols Corp.
 
 ,
 
 518 F.3d 153
 
 , 156 (2d Cir. 2008) ;
 
 see also
 

 Nat'l Fed'n of the Blind v. Lamone
 
 ,
 
 813 F.3d 494
 
 , 502-03 (4th Cir. 2016) (laying out similar standards under Title II of the ADA).
 

 The parties don't dispute the second element since restaurants are expressly designated places of public accommodation.
 
 See
 

 42 U.S.C. § 12181
 
 (7)(B). Thus, we turn to consider the record evidence on whether J.D. is disabled, and whether Colonial Williamsburg discriminated against J.D. because of his disability.
 

 III.
 

 The district court held that there was a genuine dispute of material fact as to whether J.D. is disabled, denying summary judgment to Colonial Williamsburg on this first issue. The ADA defines a "disability" in pertinent part as "a physical or mental impairment that substantially limits one or more major life activities."
 
 42 U.S.C. § 12102
 
 (1)(A). An impairment means "[a]ny physiological disorder or condition" that affects "one or more body systems," such as the neurological, digestive, or immune systems.
 
 28 C.F.R. § 36.105
 
 (b)(1)(i). "[N]ot every impairment will constitute a disability within the meaning of this section," but it will meet the definition if "it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."
 

 Id.
 

 § 36.105(d)(1)(v). Eating is a major life activity.
 

 Id.
 

 § 36.105(c)(1)(i).
 

 Here, the district court observed that the record is unclear regarding the nature and extent of J.D.'s impairment. For example, it's unclear whether J.D. has celiac disease or the less severe non-celiac gluten insensitivity, or for that matter which of his symptoms are actually caused or exacerbated by the ingestion of gluten. But viewing the facts in the light most favorable to the plaintiff, the court believed that J.D.'s impairment could qualify as a disability under the ADA.
 

 Colonial Williamsburg argues that, even if J.D.'s gluten sensitivity causes all of the symptoms he claims, the district court erred in denying summary judgment on this issue because J.D. can simply avoid foods that contain gluten. As a result, his impairment doesn't "substantially limit" a major life activity. We disagree.
 

 In considering whether an impairment substantially limits an individual in a major life activity, we construe the statutory text "broadly in favor of expansive coverage," keeping in mind that the language "is not meant to be a demanding standard."
 
 28 C.F.R. § 36.105
 
 (d)(1)(i). This interpretation is consistent with the purpose of the ADA Amendments Act of 2008 ("ADAAA"), which was passed to "reinstat[e] a broad scope of protection to be available under the ADA."
 
 Summers v. Altarum Inst., Corp.
 
 ,
 
 740 F.3d 325
 
 , 329 (4th Cir. 2014) (quoting Pub. L. No. 110-325, § 2(b)(1),
 
 122 Stat. 3553
 
 ). Furthermore, the ADAAA makes explicit that the "substantially limits" inquiry is to be made "without regard to the ameliorative effects of mitigating measures," such as "learned behavioral ... modifications."
 
 42 U.S.C. § 12101
 
 (4)(E)(i). Instead, we are to consider impairments in their "
 
 unmitigated
 
 state."
 
 Rohr v. Salt River Project Agric. Improvement & Power Dist.
 
 ,
 
 555 F.3d 850
 
 , 862 (9th Cir. 2009).
 

 Here, we agree with the district court that J.D.'s need to maintain a strict diet is a learned behavioral modification, which
 the court was prohibited from considering. In other words, the district court was required to consider the effects of J.D.'s impairment when he's not on a strict gluten-free diet.
 
 See
 
 id.
 

 ("[D]iabetes will be assessed in terms of its limitations on major life activities when the diabetic does
 
 not
 
 take insulin injections or medicine and does not require behavioral adaptations such as a strict diet."). As the district court observed, J.D. submitted extensive evidence about the serious consequences to his health when he ingests gluten. That J.D. can avoid these symptoms when he maintains a gluten-free diet is immaterial because it runs counter to the clear mandate of the ADAAA. For that reason, we also find unpersuasive those cases pre-dating the ADAAA that considered such mitigating measures.
 
 See, e.g.
 
 ,
 
 Land v. Baptist Med. Ctr.
 
 ,
 
 164 F.3d 423
 
 , 425 (8th Cir. 1999) (finding plaintiff's allergies did not constitute a disability because she could avoid peanut products).
 

 To be sure, no one can eat whatever he or she desires without experiencing some negative health effects. Nonetheless, we must "permit those who are disabled because of severe dietary restrictions to enjoy the protections of the ADA."
 
 Fraser v. Goodale
 
 ,
 
 342 F.3d 1032
 
 , 1041 (9th Cir. 2003). The evidence here-which a jury may choose to credit or not-is that J.D. and his parents must remain vigilant because the ingestion of even a small amount of gluten may have serious consequences for J.D.'s health. Unlike a person with simple diet restrictions, J.D. says that he must monitor everything he eats. And unlike a person with simple diet restrictions, J.D. alleges that he doesn't enjoy much (if any) margin for error.
 

 In short, the district court correctly determined that J.D. has raised a genuine dispute of material fact as to whether he is disabled within the meaning of the ADA.
 

 IV.
 

 We next consider whether Colonial Williamsburg discriminated against J.D. because of his disability. The ADA defines discrimination, in part, as:
 

 a failure to make
 
 reasonable
 
 modifications in policies, practices, or procedures, when such modifications are
 
 necessary
 
 to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would
 
 fundamentally alter
 
 the nature of such goods, services, [etc.].
 

 42 U.S.C. § 12182
 
 (b)(2)(A)(ii) (emphases added).
 

 The Supreme Court has explained that this provision "contemplates three inquiries": (1) whether the requested modification is "necessary" for the disabled individual; (2) whether it is "reasonable"; and (3) whether it would "fundamentally alter the nature" of the public accommodation.
 
 Martin
 
 ,
 
 532 U.S. at
 
 683 n.38,
 
 121 S.Ct. 1879
 
 . The plaintiff bears the burden of proving that the requested modification is both necessary and reasonable; the defendant bears the burden of proving that the requested modification would be a fundamental alteration.
 
 See
 

 Lamone
 
 ,
 
 813 F.3d at
 
 507-08 ;
 
 A.L. ex rel. D.L. v. Walt Disney Parks & Resorts US, Inc.
 
 ,
 
 900 F.3d 1270
 
 , 1292 (11th Cir. 2018). For each step, the ADA requires an "individualized inquiry" based on particular circumstances.
 
 Martin
 
 ,
 
 532 U.S. at 688
 
 ,
 
 121 S.Ct. 1879
 
 .
 

 In this case, the district court ultimately granted summary judgment on the "necessary" prong. The court determined that J.D.'s request to bring his homemade meal inside Shields Tavern was not a "necessary" modification under the ADA because the gluten-free meal offered by Shields
 Tavern would have provided J.D. with full and equal enjoyment of the restaurant. As a result, the district court declined to reach the reasonableness or fundamental alteration inquiries.
 

 A.
 

 We begin by considering whether J.D's requested modification was necessary. In conducting this inquiry, courts have used a "like experience" standard, meaning that public accommodations must start by considering how their facilities are used by nondisabled guests and then must take necessary and reasonable steps to provide disabled guests with a "like experience."
 
 A.L. v. Walt Disney
 
 ,
 
 900 F.3d at
 
 1296 ;
 
 accord
 

 Argenyi v. CreightonUniv.
 
 ,
 
 703 F.3d 441
 
 , 451 (8th Cir. 2013) ;
 
 Baughman v. Walt Disney World Co.
 
 ,
 
 685 F.3d 1131
 
 , 1135 (9th Cir. 2012). This approach is consistent with the ADA, which "guarantees the disabled more than mere access to public facilities; it guarantees them 'full and equal enjoyment.' "
 
 Baughman
 
 ,
 
 685 F.3d at 1135
 
 (quoting
 
 42 U.S.C. § 12182
 
 (a) ).
 

 Under this framework, the district court determined that Shields Tavern offered food and an 18th-century atmosphere to its guests. And, it concluded, Shields Tavern didn't deny J.D. a like experience because the restaurant would have prepared J.D. a gluten-free meal or would have allowed him to remain inside, enjoy the atmosphere, and eat his meal later. Thus, J.D.'s requested modification wasn't necessary for full and equal enjoyment of the restaurant.
 

 On appeal, J.D. argues that the district court erred in not drawing factual inferences in his favor. Specifically, he contends the district court ignored his history of repeatedly getting sick when eating purportedly gluten-free meals prepared by commercial kitchens, which (he says) shows that he was at a significant risk had he accepted the gluten-free meal offered by Shields Tavern. We agree with J.D. that this testimony is crucial to determining whether his requested modification was necessary to ensure full and equal enjoyment of the restaurant.
 
 [7]
 

 In
 
 Martin
 
 , the Supreme Court touched briefly in dicta on the meaning of "necessary" as it is used in the ADA.
 
 532 U.S. at 682
 
 ,
 
 121 S.Ct. 1879
 
 . The plaintiff, a professional golfer with a degenerative circulatory disorder, requested a waiver of the PGA Tour's walking rule so he could ride his golf cart between the 18 holes at tournaments.
 

 Id.
 

 at 667-69
 
 ,
 
 121 S.Ct. 1879
 
 . The Court accepted the PGA Tour's concession that the request was reasonable and necessary. The Court then explained: "Martin's claim thus differs from one that might be asserted by players with less serious afflictions that make walking the course uncomfortable or difficult, but not beyond their capacity. In such cases, an accommodation might be reasonable but not necessary."
 

 Id.
 

 at 682
 
 ,
 
 121 S.Ct. 1879
 
 .
 

 Two of our sister circuits have applied this statement regarding a plaintiff's capacity when analyzing the "necessary" prong. First, in
 
 Argenyi
 
 , a hearing-impaired medical student requested certain auxiliary aids and services.
 
 703 F.3d at 450
 
 . Creighton University provided some accommodations, but Argenyi showed that he was still unable to follow lectures and classroom dialogue or successfully communicate with clinical patients. Thus, the evidence was that "aspects of his medical education" were not just "uncomfortable or
 difficult," but "beyond his capacity."
 

 Id.
 

 From such evidence, the Eighth Circuit said, a reasonable factfinder could determine that "Argenyi was denied an opportunity to benefit from medical school equal to that of his nondisabled classmates."
 

 Id.
 

 at 451
 
 .
 

 Next, in
 
 A.L. v. Walt Disney
 
 , a group of individuals with severe autism challenged the sufficiency of the defendant's Disability Access Service program for its theme parks.
 
 900 F.3d at 1296-98
 
 . Although Walt Disney allowed disabled plaintiffs to wait "virtually" for ride attractions without standing in line, the plaintiffs' evidence showed that they had no concept of time, could not defer gratification, and could not wait for rides.
 

 Id.
 

 Thus, the evidence suggested that waiting for rides, even virtually, was "beyond the capacity of plaintiffs."
 

 Id.
 

 at 1296
 
 . Disney's existing program, said the Eleventh Circuit, "accommodate[d] the need to avoid physical lines, but not the need to avoid waits."
 

 Id.
 

 at 1297
 
 . This accommodation, then, "as good as it may be, still fail[ed] to address plaintiffs' alleged impairments."
 

 Id.
 

 at 1298
 
 . And because factual disputes existed as to those impairments, the court reversed the district court's grant of summary judgment on the "necessary" inquiry.
 

 From these cases, we make two observations. First, the "necessary" inquiry requires an individualized inquiry into the plaintiff's capacity. Only after identifying the extent of the disability can we determine what accommodations are necessary for that "particular person's disability."
 
 Martin
 
 ,
 
 532 U.S. at 688
 
 ,
 
 121 S.Ct. 1879
 
 . Here, J.D. alleges that he has a disability that prevents him from eating at restaurants. The evidence shows that J.D. repeatedly became sick when exposed to gluten at restaurants, whether from cross-contamination or from human error in following protocols. And this happened despite his parents' best efforts to ensure gluten-free meals. At summary judgment, viewing all facts and drawing all inferences in the light most favorable to J.D., we believe there is a genuine dispute on whether eating out is beyond J.D.'s capacity.
 

 Second, where an accommodation is already in place, a plaintiff may still be entitled to something more if he can show that the accommodation does not account sufficiently for his disability.
 
 [8]
 
 Here, Shields Tavern offered to accommodate J.D. by preparing him a gluten-free meal. The district court concluded that J.D.'s proposed modification was not necessary in light of this offer. We disagree.
 

 That Shields Tavern has rigorous protocols for preparing gluten-free meals is commendable and may suffice as an accommodation for the majority of people with a gluten intolerance. Indeed, a jury might well reject J.D.'s evidence about the severity of his gluten intolerance, and thus find that the protocols at Shields Tavern were sufficient to account for his disability. But in our view, J.D. has put forth enough evidence as this stage to raise a genuine dispute of material fact as to whether the proposed accommodation sufficiently accounts for his disability.
 

 In sum, the district court incorrectly overlooked the testimony that J.D. repeatedly became sick after eating purportedly
 gluten-free meals prepared by commercial kitchens. Until a jury resolves the disputes surrounding the nature and extent of J.D.'s disability, we cannot determine if the accommodation Shields Tavern offered, as good as it may be, fully accounted for his disability. Accordingly, we hold that the district court erred in finding as a matter of law that J.D.'s proposed modification was not necessary to have an experience equal to that of his classmates.
 

 B.
 

 We turn now to the second inquiry under the ADA-that is, whether the requested modification is reasonable. Although the district court declined to reach this issue, we believe remand is unnecessary because "the record suffices to define the issues properly presented for our review and to permit their fair de novo review and resolution."
 
 Hager v. Gibson
 
 ,
 
 109 F.3d 201
 
 , 207 (4th Cir. 1997) ;
 
 see also
 

 Charbonnages de France v. Smith
 
 ,
 
 597 F.2d 406
 
 , 416 (4th Cir. 1979) ("Our analysis of the record before the district court convinces us that summary judgment was not warranted on any alternative basis there revealed and urged."). Here, we are satisfied that there exists a genuine dispute of material fact as to whether J.D.'s requested modification is reasonable.
 

 Under the ADA, "[f]acilities are not required to make any and all possible accommodations that would provide full and equal access to disabled patrons," but "need only make accommodations that are reasonable."
 
 Baughman
 
 ,
 
 685 F.3d at 1135
 
 . A modification is reasonable if it is "reasonable on its face,
 
 i.e.
 
 , ordinarily or in the run of cases."
 
 Halpern
 
 , 669 F.3d at 464 (quoting
 
 U.S. Airways, Inc. v. Barnett
 
 ,
 
 535 U.S. 391
 
 , 402,
 
 122 S.Ct. 1516
 
 ,
 
 152 L.Ed.2d 589
 
 (2002) ). Reasonableness is generally a fact-specific inquiry,
 

 id.
 

 , asking whether the specific modification is "reasonable under the circumstances."
 
 Martin
 
 ,
 
 532 U.S. at 688
 
 ,
 
 121 S.Ct. 1879
 
 .
 

 J.D. argues that his request is reasonable because he asked only that Shields Tavern let him eat his prepared meal. His request didn't cost anything; nor did it require Shields Tavern to do anything. Thus, he contends, the costs of the accommodation "d[id] not clearly exceed its benefits."
 
 Lamone
 
 ,
 
 813 F.3d at 508
 
 (quoting
 
 Henrietta D. v. Bloomberg
 
 ,
 
 331 F.3d 261
 
 , 280 (2d Cir. 2003) ).
 

 J.D. also points to the fact that Shields Tavern allows parents to bring in outside food for toddlers and infants. The record also shows that (about two weeks after the events of this case) Colonial Williamsburg granted a similar accommodation to a child visiting another of its restaurants. After being notified (before the child's visit) of his severe allergies, Colonial Williamsburg determined that it could not accommodate him, and so allowed the child to eat a homemade meal in the restaurant. Although not dispositive, the fact that Colonial Williamsburg granted a similar request speaks directly to the reasonableness of J.D.'s request.
 
 See
 

 Lamone
 
 ,
 
 813 F.3d at 507-08
 
 ("[A]lthough not determinative by itself, the fact that a version of [a tool used to facilitate voting by disabled voters] was voluntarily implemented by defendants [previously] ... speaks to the reasonableness of using the tool.").
 

 In response, Colonial Williamsburg says that J.D.'s request-bringing his own food into a restaurant without any advance notice-is unreasonable on its face. Colonial Williamsburg urges that the lack of notice would be disruptive to the restaurant's operations, and that the modification would present safety and liability risks for Shields Tavern. While each of these concerns certainly touches on the reasonableness of J.D.'s request, they are not dispositive.
 

 Starting with notice, there is nothing in Title III of the ADA or the implementing regulations mandating prior notice at a place of public accommodation. And to the extent notice is even mentioned in other parts of the ADA, such as for accommodations in air and bus travel, the regulations emphasize that "advance notice requirements are generally undesirable" and should be used only when necessary to ensure the accommodation can be made, such as when extra staffing is needed. 49 C.F.R. pt. 37, app. D, § 37.169 (bus travel);
 
 see also
 

 14 C.F.R. § 382.27
 
 (a) (air carrier "must not require a passenger with a disability to provide advance notice in order to obtain services or accommodations" except as enumerated). What's more, even if a person fails to give the requisite advance notice under these regulations, the entity must still provide the accommodations if it can reasonably do so.
 
 See
 
 49 C.F.R. pt. 37, app. D, § 37.169 ;
 
 14 C.F.R. § 382.27
 
 (g).
 

 Accordingly, we cannot say that J.D.'s request was unreasonable on its face merely because he failed to provide notice. Instead, the timing of the request is simply an additional fact to consider in the totality of circumstances.
 
 See
 

 Zukle v. Regents of Univ. of Cal.
 
 ,
 
 166 F.3d 1041
 
 , 1051 n.16 (9th Cir. 1999) (late timing of request contributed to court's finding of unreasonableness);
 
 Dee v. Md. Nat'l Capitol Park & Planning Comm'n
 
 , No. CBD-09-491,
 
 2010 WL 3245332
 
 , at *6 (D. Md. Aug. 16, 2010) (30 minutes' notice was not per se unreasonable). J.D. argues that the timing of his request was reasonable because he wasn't asking Shields Tavern to take any action or provide any additional services. He also points to evidence that Shields Tavern allows outside food for toddlers and infants without prior notice. Thus, we believe J.D. has put forth sufficient evidence such that a jury could find his request reasonable despite the lack of notice.
 

 Next, Colonial Williamsburg argues that J.D.'s requested modification is unreasonable because it is contrary to the Virginia Health Code and presents safety and liability risks. Neither argument suffices to show that J.D.'s requested modification is unreasonable as a matter of law.
 

 The relevant state health code provision bars "[f]ood prepared in a private home" from being "used or offered" in a restaurant.
 
 12 Va. Admin. Code § 5-421-270
 
 (B). While there is no Virginia case law interpreting this provision, we agree with J.D. that this provision prohibits restaurants from serving food prepared in a private home, but it doesn't necessarily prohibit customers from bringing in outside food.
 

 And although "[a] public accommodation may impose legitimate safety requirements that are necessary for safe operation,"
 
 28 C.F.R. § 36.301
 
 (b), such requirements won't inevitably override a reasonable modification request.
 
 See
 

 Lamone
 
 ,
 
 813 F.3d at 508
 
 ("[R]equiring public entities to make changes to rules, policies, practices, or services is exactly what the ADA does." (citation omitted)). Moreover, it's unclear if J.D.'s request would truly pose a safety concern. There is no evidence about the risks of contamination from J.D.'s meal, and (as the record shows) Shields Tavern permits guests to bring outside food in other circumstances.
 

 Our discussion thus far exemplifies the fact-intensive nature of this reasonableness inquiry. Such an inquiry is best left to a jury, who can weigh the competing evidence and make credibility determinations. Because J.D. has put forth evidence from which a jury may infer that the requested modification is reasonable under these circumstances,
 
 see
 

 Halpern
 
 , 669 F.3d at 464, we hold that there is a genuine dispute of material fact on reasonableness.
 

 C.
 

 Finally, we consider whether the requested modification would "fundamentally alter the nature" of the goods and services.
 
 42 U.S.C. § 12182
 
 (b)(2)(A)(ii). "Under the ADA, a failure to make a reasonable modification is itself an act of discrimination unless the place of public accommodation can demonstrate that implementing the modification would fundamentally alter the nature of the program."
 
 Montalvo v. Radcliffe
 
 ,
 
 167 F.3d 873
 
 , 877 (4th Cir. 1999). Unlike the first two inquiries, the defendant bears the burden here.
 
 See
 

 Lamone
 
 ,
 
 813 F.3d at 508
 
 . But like the first two inquiries, we hold there is a genuine dispute of material fact as to whether granting J.D.'s request would have fundamentally altered the nature of the Colonial Williamsburg experience.
 
 [9]
 

 A "fundamental alteration" is a "modification to 'an essential aspect' of [a public accommodation's] program."
 
 Halpern
 
 , 669 F.3d at 464 (quoting
 
 Martin
 
 ,
 
 532 U.S. at 683
 
 ,
 
 121 S.Ct. 1879
 
 ). In
 
 Martin
 
 , the Supreme Court considered whether a waiver of the PGA Tour's walking rule would fundamentally alter the nature of the tournaments. The Court first observed that the walking rule is "not an essential attribute of the game itself."
 
 532 U.S. at 684
 
 ,
 
 121 S.Ct. 1879
 
 . The Court then rejected the argument that a waiver of this peripheral rule would alter the character of the competition by giving Martin an unfair advantage. Accepting that "the purpose of the walking rule is to subject players to fatigue, which in turn may influence the outcome of tournaments," the Court held that the purpose of the rule was "not compromised in the slightest" by the accommodation because it was uncontested that Martin "easily endures greater fatigue even with a cart than his able-bodied competitors do by walking."
 

 Id.
 

 at 690
 
 ,
 
 121 S.Ct. 1879
 
 . Thus, the modification did not fundamentally alter the tournament.
 

 We reached a different conclusion in
 
 Montalvo
 
 . There, a father tried to enroll his 12-year-old son, who was HIV-positive, into karate classes.
 
 167 F.3d at 875
 
 . The karate school denied the boy enrollment due to the risk of transmitting HIV to other students through physical contact and frequent bloody injuries.
 

 Id.
 

 We held that the school was entitled to reject a modification that would "soften the teaching style of its program."
 

 Id.
 

 at 879
 
 . This program's "unique niche in the market was its adherence to traditional, 'hard-style' Japanese karate," and contact between participants "was an integral aspect of such a program."
 

 Id.
 

 Thus, requiring the school to make its program less combat-oriented would "constitute a fundamental alternation of the nature of its program."
 

 Id.
 

 The case before us falls somewhere between
 
 Martin
 
 and
 
 Montalvo
 
 . On one hand, as Colonial Williamsburg argues, food service is an essential aspect of Shields Tavern. Indeed, it's
 
 the
 
 essential aspect. Thus, a jury could reasonably find that requiring the Tavern to allow outside food would fundamentally alter the nature of this service. On the other hand, a jury could reasonably conclude that granting J.D.'s specific request would not have affected the experience of the other patrons in the restaurant. And though food sales are essential to Shields Tavern's bottom line, there is no evidence that Colonial
 Williamsburg has been deluged with requests from people seeking to bring in outside food such that it couldn't give "individualized attention to the handful of requests that it might receive."
 
 Martin
 
 ,
 
 532 U.S. at 691
 
 ,
 
 121 S.Ct. 1879
 
 . Thus, a jury could reasonably find that accommodating the occasional request of someone with severe food sensitivities would not fundamentally alter the Tavern's business model, especially if other family members purchase food or (as happened here) if the meals are already paid for as part of a group rate. In short, the question whether granting J.D.'s request would fundamentally alter the nature of Shields Tavern's services may reasonably be resolved in favor of either party. Accordingly, this issue too is for a jury to decide.
 

 ***
 

 For the reasons given, we vacate the district court's judgment and remand this case for further proceedings consistent with our opinion.
 
 [10]
 

 VACATED AND REMANDED
 

 We recite the facts in the light most favorable to J.D., as the non-moving party.
 
 See
 

 Dulaney v. Packaging Corp. of Am.
 
 ,
 
 673 F.3d 323
 
 , 324-25 (4th Cir. 2012).
 

 There is no evidence that J.D.'s father adheres to a gluten-free diet.
 

 J.D.'s father did eat a salad that had been delivered to the table before he arrived.
 

 The Virginia health code prohibits "[f]ood prepared in a private home" from being "used or offered for human consumption in a food establishment unless the home kitchen is inspected and regulated by the Virginia Department of Agriculture and Consumer Services."
 
 12 Va. Admin. Code § 5-421-270
 
 (B). The code also requires food that is "unsafe" or "contaminated" be "rendered unusable and discarded."
 

 Id.
 

 § 5-421-940(A), (C).
 

 According to Colonial Williamsburg, the head chef had already prepared the gluten-free meals based on the order placed by the school. J.D.'s father testified that the meals were not yet prepared and that the chef offered to prepare them on the spot. He alleged he did not trust the Tavern to be able to prepare gluten-free meals after preparing fried chicken meals for the other guests. The district court properly viewed these facts in the light most favorable to J.D.
 

 For purposes of summary judgment, we can analyze the ADA claim together with the claims brought under the Rehabilitation Act and the Virginians with Disabilities Act.
 
 See
 

 Halpern v. Wake Forest Univ. Health Scis.
 
 ,
 
 669 F.3d 454
 
 , 461 (4th Cir. 2012) ("To the extent possible, we construe the ADA and Rehabilitation Act to impose similar requirements. Thus, despite the different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability." (citation omitted));
 
 Tyndall v. Nat'l Educ. Ctrs., Inc.
 
 ,
 
 31 F.3d 209
 
 , 216 (4th Cir. 1994) ("The VDA standards for liability follow the standards established in the federal Rehabilitation Act of 1973 and adopted in the ADA.").
 

 At the outset, we find unpersuasive Colonial Williamsburg's argument that J.D. could have simply eaten his meal later. We hardly see how sitting at a restaurant and not eating would have provided J.D. a like experience to that of his nondisabled peers.
 

 Compare
 

 Baughman
 
 ,
 
 685 F.3d at 1136
 
 (use of a Segway at a Disney was a necessary accommodation because it would be more comfortable and dignified than the wheelchairs provided),
 
 with
 

 Coleman v. Phx. Art Musuem
 
 , No. CV 08-1833-PHX-JAT,
 
 2009 WL 1097540
 
 , at *3 (D. Ariz. Apr. 22, 2009) (plaintiff's unique hip chair device was not necessary because he did not allege why the museum's proffered wheelchairs were insufficient to meet his needs).
 

 In the district court, J.D. moved for partial summary judgment and to strike Colonial Williamsburg's affirmative defense of fundamental alteration. The district court declined to reach this issue in light of its disposition granting summary judgment on the necessary inquiry. We need not address J.D.'s motions since a genuine dispute of material fact precludes summary judgment for either party on this issue.
 

 Because Colonial Williamsburg is no longer the prevailing party, we also vacate the award of costs in its favor.