**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

### No. 18-2511

VIOLA LAIRD

        Plaintiff - Appellant,

    v.

FAIRFAX COUNTY, VIRGINIA

        Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of Virginia at Alexandria. Claude M. Hilton, Senior District Judge. (1:17-cv-01408-CMH-IDD)

Submitted: March 17, 2020                Decided: October 23, 2020

Before KEENAN, WYNN, and RICHARDSON, Circuit Judges.

Affirmed by published opinion. Judge Richardson wrote the opinion, in which Judge Keenan and Judge Wynn joined. Judge Wynn wrote a concurring opinion.

Ellen K. Renaud, SWICK & SHAPIRO, P.C., Washington, D.C., for Appellant. Julia B. Judkins, BANCROFT, MCGAVIN, HORVATH & JUDKINS P.C., Fairfax, Virginia, for Appellee.

RICHARDSON, Circuit Judge:

This suit involves allegations of discrimination and retaliation in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* Viola Laird, an employee of Fairfax County, suffers from multiple sclerosis. In 2017, Laird sued the County, claiming that she faced unlawful discrimination based on her disability when the County laterally transferred her to another department. She also claims that the transfer came in retaliation for filing a complaint with the Equal Employment Opportunity Commission. The district court granted summary judgment for the County, and we affirm.

## I.    Background

### A.    Laird's employment at the County

Laird has worked for Fairfax County for more than twenty-five years. After starting out as a file clerk, Laird worked her way up to a Contract Specialist I in the County's Department of Procurement & Material Management.

In 2012, Laird informed her boss, Cathy Muse, about her multiple sclerosis diagnosis. Seeking a "reasonable accommodation" under the ADA, Laird formally asked Muse if she could begin unscheduled telework.[1] Muse approved the request, authorizing Laird to telework "whenever she wanted to or needed to," so long as Laird let Muse know.

---

[1] Under the ADA, an employer must generally provide a reasonable accommodation—like a "modified work schedule[]," 42 U.S.C. § 12111(9)(B)—to enable a qualified person "to perform the essential functions of [a] position." 29 C.F.R. § 1630.2(o)(1)(ii). But the ADA does not require an employer to provide this accommodation when doing so would "impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A).

2

J.A. 930, 968. Laird and Muse also "agreed that either party could revisit the accommodation at any time, with management assessing the accommodation's effectiveness on at least an annual basis." J.A. 1212.

Over time, Muse found Laird's accommodation "untenable" given Laird's job. J.A. 931. Not only was it difficult for Muse to supervise Laird and ensure that she had enough work to do, but successful telework required planned absences. So the County modified Laird's accommodation, allowing her "to telework on two scheduled days per week . . . [or] 16 hours per week." *Id.* And even then, the County required Laird to come into the office for scheduled meetings.

This new schedule did not satisfy Laird. So in December 2016, she filed a complaint with the Equal Employment Opportunity Commission. In her complaint, Laird alleged that the County discriminated against her because of her disability by failing to provide the initial, more generous, accommodations. Over several months, the parties engaged in settlement discussions, in which Laird "indicated that a lateral transfer could resolve [her] EEOC charge." J.A. 1225.

The parties reached a settlement agreement in May 2017: "The County agree[d] to provide, and Laird agree[d] to accept, a lateral transfer within the County to the Fairfax County Police Department (FCPD) to the position of Buyer I, where she [would] maintain her pay grade, position within the salary band, and opportunity for future promotion." J.A. 751. Laird was also given up to 16 hours of flexible telework each work week as an accommodation, as well as a lump sum of $30,000.

3

After Laird accepted the Settlement, she was transferred to the Police Department's Quartermaster Section, which is responsible for "uniforming and equipping about 2,000 members of the agency and also some non-members." J.A. 43. It is "downstream in [the procurement] process" in that it "initiate[s] the need for something to be purchased and [ ] also receive[s] the goods when they come in." J.A. 67.

Before Laird started, Police Major Edward O'Carroll spoke with Muse about the transfer. O'Carroll suggested that Laird work in the Quartermaster Section given Laird's familiarity with procurement. O'Carroll knew that Laird could telework two days a week, and he met with Laird's new supervisor to discuss projects that would allow Laird to work remotely. As far as Laird's supervisor was concerned, Laird "was just an employee that [he] could assign to Quartermaster duties" and "[u]tilize as needed." J.A. 347.

The Police Department worked to create Laird's new job description. Titled "Management Analyst I," the position had the same pay grade as Laird's previous job. J.A. 147. According to the description, Laird was to "[a]ssist[] the Quartermaster Section with the acquisition, solicitation, negotiation, award, and contract administration for non-standard parts, inventory items, materials, public safety equipment, uniforms, and all mission critical supplies in direct support of the Fairfax County Police Department." J.A. 1239.

After a little over a month on the job, Laird complained that she was not performing the duties in her job description because they were not done in the Quartermaster Section. The Police Department met with Laird to discuss the issue in August. The Department agreed to create a new position and job description for a "Buyer I." J.A. 155–56, 162.

4

The County sent Laird the revised job description, which removed the duties that were not performed in the Quartermaster Section and renamed Laird's job title. But Laird refused to formally accept the position. To this day, Laird remains classified as a Department of Procurement & Material Management employee, although she works at the Police Department.

Since starting in the Quartermaster Section, Laird's work assignments have ranged from "general office duties that the rest of the team members are expected" to perform, J.A. 92, to completing "[a] higher-level requisition" for alcohol sensors and tint meters for police officers, J.A. 1078. Laird also researched a possible dry-cleaning contract, J.A. 90–91, 337, investigated high-density shelving for a new building, J.A. 329, "help[ed] out with the counting of inventory," J.A. 368, and updated the police uniform guide, J.A. 105.

Even with these responsibilities, Laird claims that her "opportunity for future promotion" has been hurt by the transfer. J.A. 570. According to Laird, hers "is a thinkless job, just data entry . . . and checking for expiration dates and stuff like that." J.A. 740. She finds the work "boring," although she has no complaints about her relationship with her supervisor nor about how the Police Department has accommodated her disability requests. J.A. 647, 711, 740.

**B.    Laird's lawsuit**

In December 2017, Laird sued the County in federal court. First, she alleged that the County unlawfully discriminated by demoting her because of her multiple sclerosis. Second, she asserted that the County retaliated against her because she filed a disability-

discrimination complaint. After the district court then granted the County's motion for summary judgment, Laird timely appealed. We have jurisdiction. *See* 28 U.S.C. § 1291.

## II. Discussion

We review de novo the district court's summary judgment award. *J.D. ex rel. Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 669 (4th Cir. 2019). We will grant a movant's summary judgment motion when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see J.D. ex rel. Doherty*, 925 F.3d at 669. In applying this standard, we view the evidence in the light most favorable to Laird, the nonmoving party, and draw all reasonable inferences in her favor. *Id.*

We begin by reviewing the ADA's requirements. The statute prohibits employers from "discriminat[ing]" against "qualified individual[s] on the basis of disability." 42 U.S.C. § 12112(a)–(b).[2] An employer unlawfully discriminates against an employee by, among other things, failing to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee." *Id.* § 12112(b)(5)(A); *see also id.* § 12112(b)(1)–(7). A "reasonable accommodation" may involve "job restructuring, part-time or modified work

---

[2] The ADA defines a "qualified individual" to mean "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that [the] individual holds or desires." 42 U.S.C. § 12111(8). And it defines a "disability" to include "a physical or mental impairment that substantially limits one or more major life activities." *Id*. § 12102(1)(A).

6

schedules, [and] reassignment to a vacant position." *Id.* § 12111(9)(B).[3] The ADA also prohibits retaliation against employees who seek the Act's statutory protections. 42 U.S.C. § 12203(a)–(b); *see Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 357 (2013).

When a plaintiff alleges that her employer unlawfully discriminated or retaliated against her in violation of the ADA, she can prove her claim through direct and indirect evidence. *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572, 577 (4th Cir. 2015). Otherwise, the plaintiff may proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), a familiar way to resolve claims arising under federal employment discrimination laws, *see Jacobs*, 780 F.3d at 572, 577 (applying the framework to a claim under the ADA).

Applying the *McDonnell Douglas* framework to Laird's claims, the district court found that her case faltered at the first step—the prima facie case.[4] The district court

---

[3] While a "reassignment to a vacant position" is a "reasonable accommodation," 42 U.S.C. § 12111(9)(B), the ADA does not require that an employer create a new position for a disabled employee, *see Gile v. United Airlines, Inc.*, 95 F.3d 492, 499 (7th Cir. 1996) ("An employer may be obligated to reassign a disabled employee, but only to *vacant* positions; an employer is not required to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee." (emphasis added)).

[4] The requirements to set forth a prima facie case under the ADA are similar for both discrimination claims and retaliation claims. For a discrimination claim, the plaintiff must prove that: (1) she is disabled; (2) she was a qualified individual; and (3) she suffered an adverse employment action based on her disability. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005). For a retaliation claim, the plaintiff must prove that: (1) she has engaged in protected conduct; (2) she suffered an adverse action after engaging in the protected conduct; and (3) there was a causal link between the protected conduct and the adverse action. *See Laber v. Harvey*, 438 F.3d 404, 432 (4th Cir. 2006). Thus, in both cases, the plaintiff must show that: (1) she is protected; (Continued)

explained that Laird failed to show that the County had taken an adverse action against her. Whether the record reasonably shows that Laird experienced an adverse action is the central issue on appeal.

What qualifies as an "adverse action" differs slightly depending on whether the claim is for unlawful discrimination or retaliation. For a discrimination claim, the plaintiff must show that her employer took an action that adversely "affect[ed] *employment* or alter[ed] the conditions of the *workplace*." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006) (emphasis added). But for a retaliation claim, the plaintiff is not so limited since "[t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id.* at 67.[5] However, although the *scope* of actions that qualify as an adverse action may differ, the required *effect* or adversity from such actions is described in very similar language for both claims. An alleged retaliatory action must be "materially adverse," meaning that the plaintiff must show that the action "well might have dissuaded a reasonable worker from making or supporting a charge of

---

(2) she suffered an adverse action; and (3) there is a causal link between her protected status and the adverse action.

[5] The Supreme Court in *Burlington* announced the standard for determining whether there is an adverse action for Title VII's antiretaliation provision, 42 U.S.C. § 2000e-3(a). Although Laird's case involves claims under the ADA, we treat the Title VII context as being "analogous" to the ADA for this purpose. *Adams*, 789 F.3d at 431; *see also Fox v. General Motors Corp.*, 247 F.3d 169, 176 (4th Cir. 2001). And since neither party has questioned whether *Burlington*'s standard applies only to private (not public) employees, we leave that issue for another day. *See Sturdivant v. Geren*, No. 1:09-cv-568, 2009 WL 4030738, at * 4 n.1 (E.D. Va. Nov. 19, 2009), *aff'd sub nom. Sturdivant v. McHugh*, 450 F. App'x. 235 (4th Cir. 2010).

discrimination." *Id.* at 68 (internal citations omitted). In other words, the harm must be a "'*significant*' *detriment*," not "relatively insubstantial or 'trivial.'" *Adams v. Anne Arundel Cty. Pub. Schs.*, 789 F.3d 422, 431 (4th Cir. 2015) (quoting *Burlington*, 548 U.S. at 68) (emphasis added). Similarly, for a discrimination claim, the adverse action must result in "some *significant detrimental effect*," requiring more than a position that is "less appealing" to the plaintiff. *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 219 (4th Cir. 2007) (emphasis added). Ultimately, retaliation claims and discrimination claims require fact-specific analysis that "depends on the particular circumstances of the case." *Adams*, 789 F.3d at 431. Setting aside the difference in scope, both claims share a "common element": an *adverse* action, meaning some action that results in some "'significant' detriment" to the employee. *Id.*; *see Holland*, 487 F.3d at 219.[6]

Laird asserts that she was "effectively demoted because of her disability and because she pursued a complaint of disability discrimination." J.A. 10.[7] But this claim

_____

[6] As we noted in *Strothers v. City of Laurel*, some cases in our Circuit have "recite[d] the standard of a retaliation claim as requiring an 'adverse employment action' or activity rather than simply an 'adverse action.'" 895 F.3d 317, 327 n.3 (4th Cir. 2018) (citing *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015); *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc)). But we have recognized that this "formulation was expressly rejected by the Supreme Court in *Burlington*." *Strothers*, 895 F.3d at 327 n.3 (citing *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 n.2 (4th Cir. 2007)). So we continue to "adopt the 'adverse action' formulation" to describe retaliation claims since the action "need not be employment- or workplace-related." *Id.*

[7] Laird's complaint also alleges that the County "constructively demoted [her] because of her disability . . . [and] because she pursued an EEOC Charge . . . for discrimination based on her disability." J.A. 10, 11. Yet on appeal, Laird says that she is no longer advancing her constructive-demotion claims, *see* Appellant Br. 27, so they are
(Continued)

9

fails for a simple reason: If an employee voluntarily requests a transfer, and the employer agrees to it, there is no actionable adverse action. *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999) (finding no "adverse action" where the employee requested a "downgrade"); *see also Cherkaoui v. City of Quincy*, 877 F.3d 14, 25 n.2 (1st Cir. 2017) (finding no "adverse employment action" when the plaintiff's assignment resulted from the defendant accommodating her request); *Tusing v. Des Moines Indep. Cmty. Sch. Dist.*, 639 F.3d 507, 521 (8th Cir. 2011) (finding no "adverse action" when the evidence showed that the plaintiff "voluntarily" transferred to another job). As one of our sister circuits explained, "a transfer cannot be 'because of a disability' if it occurred as the result of an employee's own request." *Doe v. Dekalb Cty. Sch. Dist.*, 145 F.3d 1441, 1454 (11th Cir. 1998); *see also Hooper v. State of Md.*, No. 94-1067, 1995 WL 8043, at *5 (4th Cir. Jan. 10, 1995) (finding no "adverse employment action" when the defendant accepted the plaintiff's "voluntary request to transfer").

For instance, in *Glymph v. Spartanburg Gen. Hosp.*, 783 F.2d 476, 477 (4th Cir. 1986), the plaintiff alleged that her employer discriminated against her because of her race by forcing her to resign from head nurse and work instead as a staff nurse. The district court rejected her claim because the plaintiff's move from head nurse to staff nurse was voluntary. *See id.* at 478. And we affirmed based on the hospital's defense that the plaintiff

---

abandoned. *See AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 92 (4th Cir. 2018). The district court correctly noted that the Fourth Circuit has yet to decide whether a claim of constructive demotion is cognizable under the ADA. And since Laird has abandoned her constructive-demotion claims, we decline to do so today.

10

voluntarily resigned. *Id.* at 478–79; *cf. Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167, 174 (4th Cir. 1988) ("If [an employee] resigned of his own free will even though prompted to do so by events set in motion by his employer, he relinquished his property interest voluntarily and thus cannot establish that the state 'deprived' him of it within the meaning of the due process clause.").

Here, the County "agree[d] to provide, and Laird agree[d] to accept, a lateral transfer . . . to the position of Buyer I." J.A. 751. To facilitate this agreement, Muse looked to transfer Laird's prior Contract Specialist I position to the Police Department and "reclassified [it] to a Buyer position because there [were] no Contract Specialists outside of" the Department of Procurement & Material Management. J.A. 938. Because all the Buyer I positions were full at the Police Department, the Police Department created a new job description, called "Management Analyst I," in the Quartermaster Section for Laird. They did so by looking at positions "that were at the same pay grade as Contract[] Specialist I" and would "utilize skills she brought with her from" the Department of Procurement & Material Management. J.A. 147, 939. The Police Department thought that putting a Buyer I position in the Quartermaster Section might lead to some confusion, which is why they originally did not give Laird that title. J.A. 154. Still, once Laird complained about the job title, the Department of Human Resources at the Police Department agreed to change the title "from Management Analyst I to [ ] Buyer I." J.A. 161.

Thus, Laird voluntarily agreed—as part of her settlement—to laterally transfer to the Police Department as a "reasonable accommodation." J.A. 751. And the County agreed to create a new position for her, even eventually agreeing to change the title of that

11

position despite the internal confusion it might cause and thus going beyond what the ADA requires. *See* 42 U.S.C. § 12111(9)(B) (listing as a "reasonable accommodation" the "reassignment to a *vacant* position" (emphasis added)). She may now telework each week and holds a job with the same salary and similar responsibilities as before. And at least on appeal, Laird no longer argues that the intolerable conditions in her prior job compelled her to accept the Settlement. *See Simpson*, 196 F.3d at 877 (holding that an agreed-upon transfer may constitute an adverse action only if the plaintiff shows that "his working conditions were so intolerable that a reasonable person would have been compelled to resign," and the conditions were "intolerable because of unlawful discrimination"). So Laird cannot now claim discrimination and retaliation based on the County's decision to make the agreed-upon transfer.[8]

\*　　　　\*　　　　\*

In sum, a transfer is not an adverse action when it is voluntarily requested and agreed upon. That is what happened here: Laird requested a lateral transfer, and the County agreed to place her in a position with the same pay and similar responsibilities. Because Laird showed no adverse action, the district court correctly determined that she failed to make out a prima facie case of discrimination and retaliation.

*AFFIRMED*

---

[8] Whether the County upheld the bargain or breached the Settlement by not creating the precise position that Laird wanted is neither here nor there. Laird only brought claims under the ADA. She did not claim breach of contract, although the Settlement permits a party to "obtain damages for [ ] breach." J.A. 752.

12

WYNN, Circuit Judge, concurring:

Because Laird clearly and unambiguously abandoned her constructive demotion claim on appeal, *see* Opening Br. at 27, I agree with the majority's conclusion that Laird failed to show an adverse action, thus dooming her ADA claims. As the majority correctly points out, "the Fourth Circuit has yet to decide" the question of whether a claim of constructive demotion is cognizable under the Americans with Disabilities Act. *See* Majority Op. at 9–10 n.7.

Today, we hold that "[i]f an employee voluntarily requests a transfer, and the employer agrees to it, there is no actionable adverse action." Majority Op. at 10. But a request for a transfer is not "voluntary" if an employee is subject to work conditions sufficiently intolerable to *force* them to seek a transfer. Put more directly, a transfer is not voluntary if the employee was constructively demoted.

Each of our sister circuits to have faced the question of whether to recognize claims of constructive demotion has decided that such claims are cognizable. Those courts have viewed constructive demotion as a natural extension of constructive discharge, a well-established adverse action, and have applied an identical analysis for both constructive demotion and constructive discharge claims. *See Fenney v. Dakota, Minn., & E. R.R. Co.*, 327 F.3d 707, 717 (8th Cir. 2003); *Simpson v. Borg-Warner Auto., Inc.*, 196 F.3d 873, 876 (7th Cir. 1999); *Sharp v. City of Houston*, 164 F.3d 923, 933–34 (5th Cir. 1999); *Kauffman v. Kent State Univ.*, 21 F.3d 428, 1994 WL 112874, at *3 (6th Cir. 1994) (unpublished table opinion); *see also Medina v. Henderson*, No. 98-5471, 1999 WL 325497, at *1 (D.C. Cir. Apr. 30, 1999) (recognizing the concept of constructive demotion without articulating a

13

standard for it); *cf. Elmore v. Dep't of Transp.*, 421 F.3d 1339, 1342 (Fed. Cir. 2005) (recognizing constructive demotion in review of Merit Systems Protection Board claims); *Diaz-Gandia v. Dapena-Thompson*, 90 F.3d 609, 614 (1st Cir. 1996) (recognizing constructive demotion in a veterans'-rights discrimination case); *Clark v. Township of Falls*, 890 F.2d 611, 618 (3d Cir. 1989) (recognizing constructive demotion under state employment statute).

We too have previously held that demotion may cause a constructive discharge. *See Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) ("Demotion can constitute a constructive discharge, especially where the demotion is essentially a career-ending action or a harbinger of dismissal."). Logic dictates that if a demotion can constitute a constructive discharge, then a constructive demotion can similarly constitute a constructive discharge. As such, the two should be reviewed under the same analysis. *See Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006) (articulating a plaintiff's burden in proving constructive discharge).